**William A. WARREN, Appellant,**

v.

**UNITED STATES of America,
et al., Appellees.**

**No. 00–5130.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 15, 2000.

Decided Dec. 26, 2000.

Gene A. Bechtel argued the cause for appellant. With him on the briefs was Patrick C. Clary.

David J. Lazerwitz, Attorney, United States Department of Justice, argued the cause for appellees. With him on the brief were Lois J. Schiffer, Assistant Attorney General, and Jeffrey C. Dobbins, Attorney, United States Department of Justice.

Before: EDWARDS, Chief Judge, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the Court filed by Chief Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Chief Judge:

William A. Warren appeals from the District Court's dismissal of his suit to quiet title to Navassa Island and its deposit of guano (bird droppings rich in nitrogen and phosphate). The District Court held that the 12–year limitations period in the Quiet Title Act ("QTA"), 28 U.S.C. 2409a(g) (1994), barred Warren's claim because he and his predecessors in interest knew, or should have known, of a claim by the United States to the Island asserted more than 12 years before Warren brought his action in February 1997. The District Court also found that, even if it had jurisdiction over the action, Warren had failed to demonstrate a legally cognizable interest in Navassa Island and its guano, because Warren's predecessors in interest possessed merely a revocable license to mine guano that the United States terminated as early as 1916.

We agree that Warren's action is barred. Numerous events establish that, at least 12 years before Warren filed his action, there was notice, both actual and constructive, of the United States' claim of sole and exclusive ownership of the Island and its mineral resources. None of Warren's predecessors in interest challenged any of the Government's claims, and there is no support for Warren's contention that the Government abandoned its claim to the Island in 1996.

Even were jurisdiction proper over Warren's quiet-title action, we agree with the District Court that neither Warren nor his predecessors in interest possessed a legally cognizable fee ownership interest in Navassa Island. Warren's predecessors in interest possessed nothing more than a revocable license to occupy the Island for the purpose of mining guano, and the United States revoked that license in the early 1900s.

## I. BACKGROUND

Navassa Island is an island of less than three square miles, located in the Caribbean Sea between Haiti and Jamaica, approximately 100 miles south of Guantanamo Bay, Cuba. See OFFICE OF THE GENERAL COUNSEL, U.S. GENERAL ACCOUNTING OFFICE, PUB. NO. GAO/OGC–98–5, REPORT TO HOUSE COMM. ON RESOURCES, U.S. INSULAR AREAS: APPLICATION OF THE

U.S. Constitution 47 (1997); *Jones v. United States,* 137 U.S. 202, 205, 11 S.Ct. 80, 34 L.Ed. 691 (1890). Peter Duncan discovered the Island, and claimed it for the United States on November 18, 1857, pursuant to the Guano Islands Act of August 18, 1856, 48 U.S.C. §§ 1411–1419 (1994). *See Jones,* 137 U.S. at 204–06, 217, 11 S.Ct. 80.

The Guano Islands Act provides for islands, rocks, or keys, not within the jurisdiction of any other government, to "be considered as appertaining to the United States," if a United States citizen discovers upon them a deposit of guano and provides notice of discovery to the Department of State. 48 U.S.C. §§ 1411, 1412. Upon giving the appropriate notice, "[t]he discoverer, or his assigns ... may be allowed, at the pleasure of Congress, the exclusive right of occupying such island, rocks, or keys, for the purpose of obtaining guano, and of selling and delivering the same to citizens of the United States." 48 U.S.C. § 1414.

On December 8, 1859, then-Secretary of State, Lewis Cass, issued a proclamation granting Edward Cooper, the assignee of Peter Duncan, "all the privileges and advantages intended by [the] act." *Jones,* 137 U.S. at 206, 11 S.Ct. 80. Cooper subsequently assigned his interest to the Navassa Phosphate Company. *See Warren v. United States,* Civ. No. 97–2415, Transcript of Motions Hearing before the Honorable Paul L. Friedman ("Hearing Tr.") at 30 (Feb. 16, 2000).

In 1889, an employee of the Navassa Phosphate Company was tried and convicted in the U.S. District Court for the District of Maryland for the murder of his supervisor on Navassa Island. *See Jones,* 137 U.S. at 203–04, 11 S.Ct. 80. The defendant argued that a federal court in the United States did not have the authority to try him because Navassa Island was not within the jurisdiction of the United States. *See id.* at 209, 11 S.Ct. 80. When the case reached the Supreme Court, the only issue was the status of Navassa Is-

land as a possession of the United States. The Supreme Court ruled that the question of the United States' sovereignty over Navassa Island was for the political branches of government, the Congress and the Executive, to determine. The opinion of the Court examined in detail the history of the exercise of United States sovereignty over Navassa Island and concluded that "the Guano Islands Act of August 18, 1856 ... is constitutional and valid; ... the Island of Navassa must be considered as appertaining to the United States." *Id.* at 224, 11 S.Ct. 80.

The removal of guano from Navassa Island continued until 1898 when, at the outset of the Spanish–American War, President William McKinley ordered all inhabitants of Navassa Island removed. *See* Hearing Tr. at 30. Thereafter, the Navassa Phosphate Company was placed in receivership, and its assets were sold at auction to pay creditors. *See id.* It is not clear how the interests of the Navassa Phosphate Company were ultimately divided. For purposes of the proceeding before this court, the Government accepts Warren's chain of title to the rights and interests of the Navassa Phosphate Company. It is not disputed that all guano mining on Navassa Island ended by 1901 and that the Navassa Phosphate Company was dissolved in 1924. *See id.*

By an Act of October 22, 1913, 38 Stat. 224 (1913), Congress appropriated $125,000 "[f]or a light station on Navassa Island, in the West Indies." Subsequently, by a Proclamation of January 17, 1916, 39 Stat. 1763 (1916), President Woodrow Wilson declared that the "Island of Navassa in the West Indies be and the same is hereby reserved for lighthouse purposes, such reservation being deemed necessary in the public interests." In support of this reservation of Navassa Island, the Proclamation recited the Guano Islands Act and the 1913 congressional appropriation.

Construction of the lighthouse was completed on October 21, 1917. Though origi-

nally tended by keepers, the lighthouse was eventually automated. The Coast Guard maintained lighthouse facilities on Navassa Island until September 1996, at which time the Coast Guard removed its equipment and facilities from the property. *See* Hearing Tr. at 31.

On July 16, 1996, Warren requested permission from the Coast Guard to land on Navassa Island to shoot a documentary. *See* Letter from Bill Warren, to Commander of the Seventh U.S. Coast Guard District (July 16, 1996), *reprinted in* Joint Appendix ("J.A.") 191, 470. He stated therein, "[a]lthough Navassa is U.S. owned, we understand that even U.S. Citizens such as ourselves are required to get your permission to land there." *Id.* On September 11, 1996, the United States granted Warren's request to visit the Island, subject to his submission of a waiver of liability and acceptance of responsibility form prior to landing. *See* Letter from B.W. Hadley, Captain, U.S. Coast Guard, to Bill Warren (Sept. 11, 1996), *reprinted in* J.A. 192. The following day, Warren submitted a letter providing "notice of his discovery, occupation and possession of Navassa Island." *See* Letter from Charles P. LeBeau, Esq., to Warren Christopher, Secretary of State (Sept. 12, 1996), *reprinted in* J.A. 148–49. The letter claimed that the Coast Guard had abandoned the Island, and requested that the Department of State enter and certify Warren's claim of discovery under the Guano Islands Act. *See id.* at 149.

On January 7, 1997, the Department of State sent an interim response to Warren, indicating that Navassa Island was already under United States' jurisdiction and that the matter had been taken under advisement. *See* Letter from T. Michael Peay, Office of the Legal Adviser, U.S. Department of State, to Charles P. LeBeau, Esq. (Jan. 7, 1997), *reprinted in* J.A. 194. On January 16, 1997, the Secretary of the Interior issued Order No. 3205, placing the civil administration of Navassa Island under the Director of the Office of Insular

Affairs. *See* Secretary's Order No. 3205, Department of the Interior (Jan. 16, 1997), *reprinted in* J.A. 361; Secretary's Order No. 3205, Amendment No. 1, Department of the Interior (Jan. 14, 1998), *reprinted in* J.A. 363. Order No. 3205 was superseded by a Memorandum of Understanding entered between the Office of Insular Affairs and the U.S. Fish and Wildlife Service on April 22, 1999, pursuant to which the Fish and Wildlife Service currently manages Navassa Island as a National Wildlife Refuge. *See* Memorandum of Understanding between the Director, U.S. Fish and Wildlife Service and the Director, Office of Insular Affairs (Apr. 22, 1999), *reprinted in* J.A. 388–90.

On February 13, 1997, Warren filed a *pro se* complaint in the U.S. District Court for the Southern District of California seeking an injunction against an alleged sale of Navassa Island and "full and complete title to the Island, buildings and guano." Complaint, *Warren v. United States*, Civ. No. 97–242–B (S.D. Cal. Feb. 13, 1997). Warren amended his complaint two more times to include additional parties such as Secretary of the Interior Bruce Babbitt and Secretary of State Madeleine Albright as defendants. *See* First Amended Complaint, *Warren v. United States*, Civ. No. 97–242–B (S.D. Cal. Aug. 26, 1997); Second Amended Complaint, *Warren v. United States*, Civ. No. 97–2415 (D.D.C. Apr. 22, 1998). In October 1997, the U.S. District Court for the Southern District of California transferred the case to the U.S. District Court for the District of Columbia. *See Warren v. United States*, Civ. No. 97–242–B, (S.D. Cal. Oct. 9.1997) (order transferring venue).

In 1998, Warren obtained a quit claim deed and assignment of interest from heirs of two individuals—James A. Woodward and George W. Grafflin—alleged assignees of the interest of the Navassa Phosphate Company. On September 17, 1998, Warren filed a third amended complaint, adding claims based on an unconstitutional taking of his property rights and violations

of the Administrative Procedure Act, and requesting the imposition of penalties against three members of Congress and the President of the United States for failing to represent adequately his interests. *See* Third Amended Complaint, *Warren v. United States,* Civ. No. 97–2415 (D.D.C. Sept. 17, 1998).

On November 25, 1998, the United States filed a motion to dismiss, arguing that the District Court lacked subject matter jurisdiction over Warren's claims and, in the alternative, moved for summary judgment. Warren filed a motion for leave to file a fourth amended complaint that the District Court subsequently granted. *See* Plaintiff's Motion for Leave to File Amended and Supplemental Complaint, Civ. No. 97–2415 (D.D.C. Apr. 5, 1999). The complaint set forth four claims based entirely on the quit claim deed and assignments of interest. Claims one and two sought declaratory relief establishing Warren's ownership and rights to Navassa Island. *See id.* In claim three, Warren claimed that Order No. 3205, "violat[ed] the separation of powers between the executive and legislative branches of government as provided in the Constitution of the United States," *id.,* and sought an injunction against continuing "such wrongful and unlawful conduct." *Id.* Claim four stated the takings claim. *Id.*

On February 16, 2000, the District Court held a hearing and dismissed Warren's claims for lack of subject matter jurisdiction. Hearing Tr. at 39–40. In the alternative, the District Court rejected the claim of fee title ownership of Navassa Island, finding that the Guano Islands Act conveyed only a revocable license, and that the President possessed the authority to reserve Navassa Island for navigational use, thereby revoking such license, based on Congress's authorization of funds for the lighthouse and the President's implied power to reserve public lands. *See id.* The District Court also dismissed the takings claim from which Warren does not appeal.

## II. ANALYSIS

The Quiet Title Act ("QTA") is the "exclusive means by which adverse claimants [may] challenge the United States' title to real property." *Block v. North Dakota,* 461 U.S. 273, 286, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983). The statute operates as a waiver of the United States' sovereign immunity as to certain quiet title actions. *See* 28 U.S.C. § 2409a(a). That waiver is limited in scope, however, and the terms of the Act "define the extent of the court's jurisdiction." *United States v. Mottaz,* 476 U.S. 834, 841, 106 S.Ct. 2224, 90 L.Ed.2d 841 (1986); *see also United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). One limitation specified in the Act is the requirement that:

> [a]ny civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

28 U.S.C. § 2409a(g).

A "test of reasonableness" applies to determine whether a plaintiff, or his predecessors in interest, "knew or should have known" of a federal claim of interest in property. *See D.C. Transit System, Inc. v. United States,* 717 F.2d 1438, 1441 (D.C.Cir.1983). "Knowledge of the claim's full contours is not required. All that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's." *Knapp. v. United States,* 636 F.2d 279, 283 (10th Cir.1980).

In this case, there is undisputed evidence in the record demonstrating that Warren and his predecessors in interest "knew or should have known" that the United States claimed an interest in Navassa Island more than 12 years before

1336

Warren filed his quiet title action. Actual notice of the United States' adverse claim of title to Navassa Island was given to Warren's predecessor in interest, James Woodward, as early as 1915, in a letter from the Assistant Secretary of the Department of Commerce. *See* Letter from E.S. Sweet, Assistant Secretary, Department of Commerce, to James Woodward (Apr. 14, 1915), *reprinted in* J.A. 315. In response to a communication from Woodward to President Wilson in which Woodward offered to sell Navassa Island to the United States, Assistant Secretary Sweet informed Woodward that "as the title to the island [of Navassa] is in the United States it is considered unnecessary to take any measures looking to the purchase of land on the island in connection with the establishment of a lightstation thereon." *Id.*

Warren's predecessors in interest were also afforded constructive notice of the United States' claim to Navassa Island. The most significant instance of such notice arose in 1916, when President Woodrow Wilson, pursuant to a congressional authorization, issued a Proclamation declaring that all of Navassa Island was unqualifiedly reserved for a lighthouse base. The Proclamation stated that

> the *said Island* of Navassa in the West Indies be and the same *is hereby reserved* for lighthouse purposes, such reservation being deemed necessary in the public interests, subject to such legislative action as the Congress of the United States may take with respect thereto.

39 Stat. 1763 (1916) (emphasis added).

Warren contends that the presidential Proclamation was not inconsistent with private ownership of the Island or the right to occupy such lands to mine guano. He contends that the lighthouse on Navassa takes up only a portion of the Island, and refers to a lighthouse located on Fenwick Island, Delaware, which allegedly operates in close proximity to private ownership interests. Whether or not the situation of Fenwick Island is as Warren as-

serts it to be, its status is unquestionably inapposite. Here we have a presidential Proclamation that clearly and lawfully reserved the *entire* Island of Navassa for use by the United States Government. The reservation of the Island served to terminate any contrary private interest in the land, if any existed at that point. And nearly 50 years after the issuance of the 1916 Proclamation, federal officials were still citing it as evidence of the United States' claim. In 1962, for example, in response to an inquiry regarding the status of Navassa Island, the Coast Guard replied that

> [t]his Island is under the sole and exclusive jurisdiction of the United States pursuant to 48 U.S.C. 1411, and by Proclamation of the President dated 17, January, 1916, the entire Island was reserved for lighthouse purposes. Therefore, it is unlike other possessions of the United States in that the entire Island is a government (Coast Guard) reservation.

Letter from D. McG. Morrison, Vice Admiral, U.S. Coast Guard, Acting Commandant, to Francis K. Campbell (Oct. 11, 1962), *reprinted in* J.A. 423–24.

Warren questions the President's authority to revoke any interest in Navassa Island. He notes that by the express provisions of the Act, the rights accorded to private tenants were terminable only "at the pleasure of *Congress*." *See* 48 U.S.C. § 1414 (emphasis added). But he ignores the important sequence of events leading to the reservation of Navassa Island as a navigational aid. In 1913, Congress sanctioned the termination of guano mining interests on Navassa Island by appropriating $125,000 for the construction of a lighthouse. *See* 38 Stat. 224 (1913). Three years later, the President formalized the revocation of guano mining interests in the Proclamation which referred to the congressional appropriation, and declared that it was "necessary" and in the "public interest" to reserve the Island for lighthouse purposes. *See* 39 Stat. 1763 (1916).

Warren contends that, even if the United States expressed an interest in Navassa Island sufficient to threaten claims of fee simple ownership, the President's act and subsequent Government acts of "ownership" did not provide constructive notice that the Government's interest· was adverse to preexisting mining rights, nor would, Warren asserts, the subsequent administration and maintenance of the Island by the Coast Guard. *See Michel v. United States,* 65 F.3d 130, 132 (9th Cir.1995) ("[W]hen the plaintiff claims a non-possessory interest such as an easement, knowledge of a government claim of ownership may be entirely consistent with a plaintiff's claim"). We find no merit in Warren's position.

"The sufficiency of actual and open possession of property is to be judged in the light of its character and location." *United States v. Fullard–Leo,* 331 U.S. 256, 279, 67 S.Ct. 1287, 91 L.Ed. 1474 (1947). In this case, Warren and his predecessors "knew or should have known the government claimed the *exclusive right*" to use the Island and to deny access to all others. *Michel,* 65 F.3d at 132 (emphasis added). Although the United States did not avail itself of the opportunity to mine the guano itself, there were significant acts, sufficient to place Warren's predecessors in interest on notice that their mining rights were in jeopardy. No private mining ventures operated on the Island after 1901. Indeed, there is no evidence of sustained occupancy on the Island by private parties after the early 1900s. Beginning in 1963 and until at least 1967, the Island was posted with signs prohibiting trespassing, and for many years the Coast Guard denied access to the Island to all but federal employees. From 1970 until 1996, the Coast Guard restricted access to Navassa, and no person was able to enter Navassa Island legally without the Coast Guard's express permission.

Since 1978 the National Oceanic and Atmospheric Administration ("NOAA") of the U.S. Department of Commerce has issued nautical charts clearly stating that

Navassa Island is a reservation administered through the Commander, Seventh Coast Guard District. Landing or *entry* on the island is prohibited, except under permit signed by the Commander, 7th U.S. Coast Guard District.

Declaration of David B. MacFarland, Captain, NOAA, *Warren v. United States,* Civ. No. 97–2415 (May 18, 1999), *reprinted in* J.A. 407–11 (emphasis added). The nautical charts are significant, because there is no way to approach Navassa Island except by sea. In addition, beginning in July 1984, the NOAA has released a publication describing Navassa Island as a federally restricted area and informing the public that requests to visit Navassa should be made to the Commander, Seventh District Coast Guard, Miami, Florida. It was presumably for this reason that Warren sought permission from the Commander of the Seventh District Coast Guard in Miami, Florida, to land on Navassa Island in July 1996.

The presidential Proclamation reserving Navassa Island for lighthouse purposes, coupled with the Coast Guard's practice of restricting access, and, for some years, denying access altogether, to the Island, as well as the Government's consistent claims of sole and exclusive ownership, reasonably and clearly indicated that the United States had revoked any outstanding rights or interests to "occupy" Navassa Island for the purpose of mining guano. Warren's predecessors in interest therefore had actual and constructive notice of the United States' claims to Navassa Island and its resources more than 12 years before Warren brought his suit to quiet title to the Island in his favor.

Warren makes an alternative argument: that the Coast Guard's removal of lighthouse equipment from Navassa Island in August 1996 was a formal abandonment of the United States' claim to the Island, and triggered a new statute of limitations period. We reject this asser-

tion. In the first place, the Government cannot abandon property without congressional authorization. *See Royal Indem. Co. v. United States,* 313 U.S. 289, 294, 61 S.Ct. 995, 85 L.Ed. 1361 (1941); *see also United States v. California,* 332 U.S. 19, 40, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947). Moreover, the undisputed facts do not support the abandonment claim. Before dismantling the lighthouse, the Coast Guard explained, in a 1995 communiqué to the American Embassy in Haiti, that "[t]he discontinuation of the lighthouse operations is in no way intended to affect U.S. possession of or jurisdiction over Navassa Island." Communiqué from Commandant Cogard, to American Embassy, Port Au Prince, (Mar.1995), *reprinted in* J.A. 466. Indeed, following the Coast Guard's removal of the lighthouse equipment, the United States continued to assert its jurisdiction over the Island, and it has continued to regulate and restrict access to the Island. In contrast, there is no proof that any of Warren's predecessors in interest ever set foot on the Island after 1901, or even inquired of the continuing viability of their rights. There is, thus, no evidence that the United States abandoned its claim to the Island, and Warren's attempt to resurrect mining interests long since terminated is based on a meritless claim. The District Court correctly determined that it was without subject matter jurisdiction to hear Warren's claim.

■ Even if the Court had jurisdiction to hear the quiet title action, it is abundantly clear that the Guano Islands Act did not convey any fee ownership interest in the land or minerals to a discoverer. As the Supreme Court explained in *Duncan v. Navassa Phosphate Co.,* 137 U.S. 647, 11 S.Ct. 242, 34 L.Ed. 825 (1891), the interest conveyed under the Act was in the nature of a "usufruct" or license to mine guano that was terminable "at the pleasure of Congress." *Id.* at 652–53, 11 S.Ct. 242. "The whole right conferred upon the discoverer and his assigns is a license to occupy the island for the purpose of re-

moving the guano." *Id.* at 651, 11 S.Ct. 242. The Act conveyed only a license that was revocable at will by the United States, and that revocation occurred when the President reserved Navassa Island for navigational purposes in 1916 pursuant to the 1913 congressional appropriation.

Warren's final argument is that this court should recognize his fee title claim to Navassa based on a "federal common law" ownership doctrine culled from the Supreme Court's decision in *United States v. Fullard–Leo,* 331 U.S. 256, 67 S.Ct. 1287, 91 L.Ed. 1474 (1947). In *Fullard–Leo,* the Supreme Court recognized the interests of private claimants (against the United States) in Palmyra Island, a former possession of the Kingdom of Hawaii. *See id. Fullard–Leo* does not, however, establish a "federal common law" right of ownership in "remote islands." Indeed, the Court expressly dismissed the possibility, stating that "[w]e are not dealing with an explorer's claim of title to lands of a savage tribe or that of a discoverer of a hitherto unknown islet." *Id.* at 268, 67 S.Ct. 1287. Rather, the Court considered the doctrine of "lost grant," which, it observed, was an established doctrine in Hawaiian common law before its annexation by the United States, and could therefore be applied against the United States, as the successor to Hawaii. *See id* at 269–70, 67 S.Ct. 1287. The lost grant doctrine has no application in this case.

### III. CONCLUSION

Warren's action is barred by the 12–year limitations period in the Quiet Title Act. Even were Warren's claim timely, it would fail for lack of merit. Accordingly, the judgment of the District Court is affirmed.

*So ordered.*