[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-11771
_____

D.C. Docket No. 4:12-cv-10072-JEM

F.E.B. CORP., a Florida corporation,

Plaintiff - Appellant,

versus

UNITED STATES OF AMERICA,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(March 28, 2016)

Before WILSON, JULIE CARNES, and EBEL,[*] Circuit Judges.

EBEL, Circuit Judge:

_____

[*] Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by designation.

Plaintiff-Appellant F.E.B. Corp. ("F.E.B.") brought this action against Defendant-Appellee United States ("the government") seeking to quiet title to a spoil island just off Key West, Florida. Because we find that the Quiet Title Act's statute of limitations has run, see 28 U.S.C. § 2409a(g), we AFFIRM the district court's dismissal of the action for lack of subject matter jurisdiction.

## I.  BACKGROUND

The island in question, known as Wisteria Island (or "the island"), is situated in the Gulf of Mexico, less than a mile off the coast of Key West, Florida. It is not a natural island, but rather was formed as a result of dredging operations performed under the auspices of the United States Navy ("Navy") in nearby Key West Harbor during the first half of the nineteenth century. As Navy contractors deepened the channels in the harbor to improve shipping and aviation access, they deposited the dredged material on a nearby plot of submerged land. The accumulations eventually rose above sea level. A substantial dredging project in 1943 made the thirty-nine-acre (later-named) Wisteria Island what it is today.[1]

In 1951, the state of Florida issued notice of its intention to sell Wisteria Island. The United States objected to the sale of the island on the grounds that the

---

[1] Although the parties dispute whether Wisteria Island first came into existence in the 1920s or 1940s, that dispute is immaterial to the statute of limitations question.

2

island belonged to the United States.  In a letter to the state, the United States traced its ownership of the island and surrounding area to an 1819 treaty with Spain, as confirmed by subsequent 1845 and 1924 Executive Orders.  The United States concluded, "In view of the foregoing [Florida is] informed that the Department of the Navy considers . . . the spoil area in question as being the property of the United States.  It is, therefore, requested, that no further action be taken . . . to dispose of the spoil area in question by sale or otherwise."  (Doc. 1--32.)

In his own letter to the state, Florida's attorney general acknowledged the United States' claim, but expressed doubt as to its validity, opining:

> I am unable to state definitively whether or not the Navy's claim is valid.  However, I do think that the claim is debatable enough and so shrouded in antiquity that I think the best course would be for [Florida] to complete the sale and explain the Navy's claim to [the buyer] and allow him to accept the . . . deed at his own risk. . . .  In this manner we can get the question of title settled one way or other in case the Navy decides to litigate with him.

(Doc. 1-33.)  Accordingly, in 1952, Florida sold the island to a private party via a quitclaim deed that contained no warranties of title.

One year later, Congress enacted the Submerged Lands Act ("SLA"), 43 U.S.C. §§ 1301-1315, which, broadly speaking, granted the states ownership of submerged lands within three miles of their coastlines, subject to certain

3

exceptions. In the years that followed, the United States did not reassert its claim to Wisteria Island. Title passed from private owner to private owner until F.E.B. acquired the island in 1967. The federal government appeared to acquiesce to F.E.B.'s ownership, and even entered into licensing agreements with F.E.B. to use the island as a Navy training ground from 2004 to 2006.

In 2011, however, the United States once again asserted ownership over Wisteria Island.[2] F.E.B. filed this suit under the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a, to establish ownership of the island. F.E.B. argues that it owns the island pursuant to the SLA and Florida law. The district court, however, did not reach the merits of F.E.B.'s SLA claim in this quiet title action. On cross-motions for summary judgment, the district court found that the QTA's statute of limitations had run, and accordingly dismissed the suit for lack of subject matter jurisdiction. F.E.B. now appeals.

## II. DISCUSSION

"We review a district court's application of a statute of limitations and its grant of summary judgment de novo." McCaleb v. A.O. Smith Corp., 200 F.3d 747, 750 (11th Cir. 2000). "Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter

---

[2] F.E.B. contends the government's renewed interest in the island was precipitated by the unsanctioned actions of two low-level employees sympathetic to activists opposing development of the island. Be that as it may, it would be immaterial to the statute of limitations question.

4

of law." Id.  In this case, the parties agree that there are no material factual issues in dispute and, consequently, that the statute of limitations question may be decided as a matter of law.

## A.  The QTA

This case is animated by the intersection of two federal statutes:  the Quiet Title Act and the Submerged Lands Act.  We begin with the QTA.

"The QTA . . . waives the United States'[] sovereign immunity and 'permits plaintiffs to name it as a party defendant in civil actions to adjudicate title disputes involving real property in which the United States claims an interest.'"  McMaster v. United States, 177 F.3d 936, 939 (11th Cir. 1999) (quoting Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 276 (1983) (internal alteration omitted)); see 28 U.S.C. § 2409a(a) ("The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest . . . .").  As such, it "provide[s] the exclusive means by which adverse claimants [can] challenge the United States' title to real property."  Block, 461 U.S. at 286.

The QTA has a twelve-year statute of limitations, which is triggered when the plaintiff's QTA action first accrues.  See 28 U.S.C. § 2409a(g) ("Any civil action under this section . . .  shall be barred unless it is commenced within twelve

5

years of the date upon which it accrued.").  A QTA action accrues when "the plaintiff or his predecessor in interest knew or should have known of the claim of the United States" to the real property at issue.  Id.

The Supreme Court has twice concluded that, because the statute of limitations circumscribes the scope of the QTA's waiver of sovereign immunity, compliance with the limitations period is jurisdictional.  See United States v. Mottaz, 476 U.S. 834, 841 (1986) ("When the United States consents to be sued, the terms of its waiver of sovereign immunity define the extent of the court's jurisdiction."); Block, 461 U.S. at 292 ("If North Dakota's suit is barred by [the QTA statute of limitations], the courts below had no jurisdiction to inquire into the merits."); see also Bank One Texas v. United States, 157 F.3d 397, 403 (5th Cir. 1998). [3]  For the same reason, the limitations period "must be strictly observed," and courts "must be careful not to interpret it in a manner that would 'extend the

---

[3] Our conclusion is consistent with the Supreme Court's recent holding in United States v. Kwai Fun Wong, 135 S. Ct. 1625 (2015).  In that case, the Supreme Court established a rebuttable presumption that equitable tolling applies to statutes of limitation for suits against the federal government unless (1) Congress has "clearly stated" that a time limit is jurisdictional or (2) stare decisis requires adherence to the Supreme Court's past determination that a time limit is jurisdictional.  See id. at 1630-32, 1635-36 (relying on Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 95-96 (1990) (establishing the presumption) and John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 137-39 (2008) (applying stare decisis to decide whether a time limit was jurisdictional)). Pursuant to Kwai's emphasis on stare decisis principles, we adhere to the Supreme Court's previous treatment of the QTA statute of limitations as jurisdictional.  See Mottaz, 476 U.S. at 841, 843; Block, 461 U.S. at 287-88, 292.

waiver beyond that which Congress intended.'" Block, 461 U.S. at 287 (quoting United States v. Kubrick, 444 U.S. 111, 117-18 (1979)).

Accordingly, courts have consistently held that the QTA's statute of limitations standard "does not require the government to provide explicit notice of its claim" in order for the statute of limitations to begin running. Spirit Lake Tribe v. N. Dakota, 262 F.3d 732, 738 (8th Cir. 2001). "The government's claim need not be 'clear and unambiguous,'" and "[k]nowledge of the claim's full contours is not required." Id. (quoting first N.D. ex rel. Bd. of Univ. & Sch. Lands v. Block, 789 F.2d 1308, 1313 (8th Cir. 1986), then Knapp v. United States, 636 F.2d 279, 283 (10th Cir. 1980)). Rather, "[a]ll that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's." Id. (quoting Knapp, 636 F.2d at 283); see also Kingman Reef Atoll Invs., LLC v. United States, 541 F.3d 1189, 1198 (9th Cir. 2008) (same); Cheyenne Arapaho Tribes v. United States, 558 F.3d 592, 595 (D.C. Cir. 2009) (same). Moreover, the merits of the government's claim are irrelevant: "Even invalid government claims trigger the QTA limitations period." Spirit Lake, 262 F.3d at 738; see also Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 769 (4th Cir. 1991) ("The crucial issue in the statute of limitations inquiry is whether the plaintiff had notice of the federal claim, not whether the claim itself is valid.").

In this case, it is undisputed that the state of Florida, F.E.B.'s predecessor in interest, had actual knowledge of the United States' claim to the island in 1951. The United States' 1951 letter objecting to Florida's intention to sell the island plainly set forth the Navy's claim of ownership over the island:  The letter traced the United States' ownership of the spoil area to an 1819 treaty with Spain, and informed Florida "that the Department of the Navy considers . . . the spoil area in question as being the property of the United States."  (Doc. 1-32.)  Such an explicit and unambiguous assertion of a property interest more than meets the QTA's accrual requirements.  See Knapp, 636 F.2d at 283; Spirit Lake, 262 F.3d at 738.

Beyond that, Florida's actual knowledge of the federal government's claim is evidenced by the Florida attorney general's letter to the state agency attempting to sell the island.  The letter acknowledged the Navy's claim, but nonetheless urged the agency to "complete this sale and explain the Navy's claim to [the buyer] and allow him to accept the . . . deed at his own risk. . . .  In this manner we can get the question of title settled one way or [the] other in case the Navy decides to litigate with him."  (Doc. 1-33.)  The fact that Florida duly issued the original private buyer only a quitclaim deed, with no warranties of title, further establishes Florida's awareness of the federal government's claimed interest.  Because F.E.B.'s predecessor in interest had actual knowledge of the United States' claim

8

to the real property at issue in 1951, F.E.B.'s QTA claim expired in 1963—well before initiation of this suit.[4]  See 28 U.S.C. § 2409a(g).  Therefore, the district court was correct to dismiss the case for lack of subject matter jurisdiction.

## B. The SLA

F.E.B. contends that, although the QTA's limitations period may have been triggered in 1951, the period did not expire, because the intervening passage of the SLA countervailed the United States' 1951 assertion of ownership.

Congress enacted the Submerged Lands Act, 43 U.S.C. §§ 1301-1315, in 1953 in reaction to the Supreme Court's ruling in United States v. California (California I), 332 U.S. 19 (1947), which held that the United States—not the states—had "paramount sovereign rights" to submerged lands seaward of the states' coasts.  See United States v. Alaska, 521 U.S. 1, 5-6 (1997).  The SLA counteracted that holding, and instead "grant[ed] States submerged lands beneath a 3-mile belt of the territorial sea."  Id. at 35; see 43 U.S.C. § 1311(a), (b)(1) ("confirm[ing]" and "establish[ing]" states' "title to and ownership of the lands beneath navigable waters within [their] boundaries" and "releas[ing] and

---

[4] That F.E.B.'s cause of action both arose and expired before the QTA was enacted in 1972 is of no legal moment:  "The legislative history is clear that Congress intended to foreclose totally any suit on claims that accrued more than twelve years prior to the effective date of the QTA." Block, 461 U.S. at 286 n.23; see also Knapp, 636 F.2d at 282 (rejecting "the argument that an action under section 2409a cannot accrue before Congress created the right in 1972 to bring such actions"); Grosz v. Andrus, 556 F.2d 972, 975 (9th Cir. 1977) (same).

9

relinquish[ing] . . . all right, title, and interest of the United States . . . in and to all said lands"), § 1312 (defining states' boundaries as reaching three miles seaward from their coastlines); § 1301(a)(3) (defining "lands beneath navigable waters" to include "all filled in, made, or reclaimed lands which formerly were lands beneath navigable water").[5]

Not all submerged (or formerly submerged) lands within that boundary, however, fall within the SLA. The SLA contains numerous exceptions, including, for example, lands actually occupied by the United States under claim of right, lands acquired by eminent domain, and, of particular relevance here, "all lands filled in, built up, or otherwise reclaimed by the United States for its own use." 43 U.S.C. § 1313(a) (emphasis added).[6]

---

[5] Even though Wisteria Island had been built up above sea level by the time the SLA was enacted, the parties agree that, unless an exception applies, the island falls within the SLA's definition of submerged lands. See 43 U.S.C. § 1301(a)(3) (defining submerged lands to include "all filled in, made, or reclaimed lands which formerly were lands beneath navigable waters").

[6] In full, the exceptions include:

> (a) [A]ll tracts or parcels of land together with all accretions thereto, resources therein, or improvements thereon, title to which has been lawfully and expressly acquired by the United States from any State or from any person in whom title had vested under the law of the State or of the United States, and all lands which the United States lawfully holds under the law of the State; all lands expressly retained by or ceded to the United States when the State entered the Union (otherwise than by a general retention or cession of lands underlying the marginal sea); all lands acquired by the United States by eminent domain proceedings, purchase, cession, gift, or otherwise in a proprietary capacity; all lands filled in, built up, or otherwise reclaimed by the United States for its own use; and any rights the United States has in lands presently and actually occupied by the United States under claim of right;

F.E.B. argues that the generic language in the SLA abandoned the federal government's previously-expressed claim to the (formerly submerged) Wisteria Island, which in turn effectively reset the QTA's statute of limitations period for that island. A few of our sister circuits, in other contexts not involving the SLA, have accepted the possibility that the government's express abandonment of a claim can prevent a previously-triggered QTA's limitations period from expiring (although no case that has come to our attention has found that abandonment in fact occurred). See Spirit Lake Tribe, 262 F.3d at 739; Kingman, 541 F.3d at 1199-1201; Cheyenne Arapaho, 558 F.3d at 597; cf. Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclam., 599 F.3d 1165, 1186 (10th Cir. 2010) (assuming, "without definitively deciding," that abandonment could reset the limitations period). The bar for showing such abandonment, however, is high.

It is well-established that "the federal government cannot abandon property absent an affirmative act authorized by Congress." Int'l Aircraft Recovery, LLC v. Unidentified, Wrecked & Abandoned Aircraft, 218 F.3d 1255, 1258 (11th Cir.

---

(b) such lands beneath navigable waters held, or any interest in which is held by the United States for the benefit of any tribe, band, or group of Indians or for individual Indians; and
(c) all structures and improvements constructed by the United States in the exercise of its navigational servitude.

43 U.S.C. § 1313 (emphasis added).

11

2000).  Moreover, "officers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act." California I, 332 U.S. at 40. Accordingly, our sister circuits have consistently held that, for purposes of the QTA statute of limitations, the United States will be deemed to have abandoned a claim of ownership only if (1) "it clearly and unequivocally abandons its interest," as evidenced by (2) sufficiently formal "documentation from a government official with authority to make such decisions on behalf of the United States." Kingman, 541 F.3d at 1201 (internal quotation marks omitted); see also Rio Grande, 599 F.3d at 1186 (same); Spirit Lake, 262 F.3d at 739 (same); Cheyenne Arapaho, 558 F.3d at 597 (same).

We have no difficulty concluding that the SLA does not rise to the level of the "clear and unequivocal" abandonment of the government's interest in Wisteria Island necessary to reset the QTA statute of limitations.[7]  The SLA only "release[d] and relinquishe[d]" the United States' interest in submerged lands "except as otherwise reserved [t]herein."  43 U.S.C. § 1311(b).  One such reservation excepts from the SLA "all lands filled in, built up, or otherwise reclaimed by the United States for its own use." Id. § 1313(a) (emphasis added).

---

[7] Of course, because the SLA was passed by Congress, the second prong is met.  See Alabama v. Texas, 347 U.S. 272, 273 (1954) (per curiam) (holding that the SLA was a constitutional exercise of Congress's power to dispose of the United States' property).

Wisteria Island's origin is undisputed:  It was built up by Navy contractors, who used the land for the government's purpose and benefit of storing fill accumulated from nearby dredging operations. [8]  Thus, the plain language of the SLA refutes F.E.B.'s argument that the SLA clearly and unequivocally conveyed title in Wisteria Island to the neighboring state of Florida.  Consequently, the statute of limitations period to challenge the federal government's ownership of Wisteria Island continued running in the wake of the SLA, and expired long before F.E.B filed this action.

### C. F.E.B.'s Arguments

We find F.E.B.'s multifarious arguments to the contrary unpersuasive.

#### 1.  For the United States' "own use"

First, F.E.B. argues the exception does not apply because the United States did not build up or fill in the island "for its own use," 43 U.S.C. § 1313(a).  Rather, F.E.B. contends, the United States created Wisteria Island incidentally, for the sole purpose of storing the fill that created it, and never used it for anything else.  Of course, in ruling on the statute of limitations question, we do not dispositively rule on the merits of F.E.B.'s SLA claim, including as to whether using the island as a place to store fill constitutes "use" under the relevant SLA exception.  See Mottaz,

---

[8] It is also undisputed that Florida, F.E.B.'s predecessor, had actual knowledge of how the island was created.

13

476 U.S. at 851 ("The limitations provision of the Quiet Title Act reflects a clear congressional judgment that the national public interest requires barring stale challenges to the United States' claim to real property, whatever the merits of those challenges."). For statute of limitations purposes, the crucial issue is whether the SLA clearly and unequivocally abandoned the United States' interest in the island. It is well-established—and was well-established when the SLA was enacted—that grants of federal property are construed strictly in favor of the United States. See Alaska, 521 U.S. at 34-35; United States v. Union Pac. R.R. Co., 353 U.S. 112, 116 (1957) (applying "the established rule that land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it.") (citing Caldwell v. United States, 250 U.S. 14, 20 (1919)). Given that rule of construction, the circumstances of Wisteria Island's creation hew closely enough to the "for its own use" exception to the SLA to preclude a finding that the SLA clearly and unequivocally abandoned the federal government's interest in that island.

That conclusion comports with the Supreme Court's only treatment of the exception.[9] See California ex rel. State Lands Comm'n v. United States

---

[9] In addition, the conclusion is consistent with the SLA's legislative history, which shows that Congress added the exception in response to the Navy's concern that the SLA would strip it of

14

(California II), 457 U.S. 273, 287 (1982). In California II, the Supreme Court stated in dicta that the SLA exception for land built up by the United States "for its own use" would apply to coastline that had slowly accreted after the United States constructed jetties nearby, even though the accretion was inadvertent, and the resulting coastline had remained barren and unused for the first eighty years of its existence. Id. at 275-76, 287. That result, the Supreme Court reasoned, "follow[ed] from the congressional object to assure each sovereign the continuing benefit of landfill and like work performed by each."[10] Id. at 287. Wisteria Island surely was both created and used for a more functional purpose than the inadvertent accretions at issue in California II.

Although F.E.B.'s predecessors did not have the benefit of California II, as discussed above, even the SLA's plain language put them on notice that the cloud on the island's title remained unresolved. The SLA did not abandon the United States' interest in the island for purposes of the QTA statute of limitations.

---

submerged lands that it had "improved." See Submerged Lands: Hearings on S.J. Res. 13, S. 294, S. 107, S. 107 Amend. Before the S. Comm. on Interior and Insular Affairs, 83rd Cong. 544-556 (1953) (statement of Robert B. Anderson, Secretary of the Navy). The Navy specifically listed "fill" as one of the "improvements" at Key West Naval Station that it sought to shield from the SLA. Id. at 547, 549-50.

[10] Although California II's discussion of the exception is dicta, "there is dicta . . . and then there is Supreme Court dicta." Schwab v. Crosby, 451 F.3d 1308, 1325 (11th Cir. 2006). We have consistently recognized that "dicta from the Supreme Court is not something to be lightly cast aside," id. (quotation marks omitted), but rather is of "considerable persuasive value," United States v. City of Hialeah, 140 F.3d 968, 974 (11th Cir. 1998).

15

### 2.  Actions by federal employees

Second, F.E.B. points to subsequent actions by various federal employees appearing to affirm Florida's ownership of Wisteria Island:  For instance, a 1956 internal memo by the Chief of the Bureau of Yards and Docks to the Chief of Naval Operations opined, "[i]t would appear that . . . the Navy would have a difficult time in proving that this island was built up for Federal use," and accordingly recommended condemning the island for subsequent federal use (Doc. 67-1); a 1957 letter by the Navy's District of Public Works Officer requested condemnation appraisals of the island; and 1961 court documents condemning an adjacent island (which may have been created during the same dredging operations that created Wisteria Island) acknowledged that Florida owned and held legal title to the adjacent island prior to the condemnation.

It is, however, well-established that internal agency memos or other informal statements by subordinate government employees are not sufficient evidence of abandonment.  See Rio Grande, 599 F.3d at 1187 ("[I]ntra-office memoranda, and similar intra-governmental communications do not bind the government, such that they can . . . stop the QTA's limitations clock.") (internal quotation marks omitted); Kingman, 541 F.3d at 1200-01 (agreeing that documents

16

evincing only "confusion and mistake on the part of some government employees, as to whether the United States ultimately possessed an ownership interest," did not show abandonment); Spirit Lake, 262 F.3d at 740-42, 44 ("[T]he QTA limitations period does not stop when government action simply compounds a pre-existing cloud on title."); Cheyenne Arapaho, 558 F.3d at 598. So, too, here: Nothing in the documents F.E.B. identifies amounts to a "clear and unequivocal" abandonment of the United States' claim, and, even if something did, there is no indication that the authors possessed the authority to dispose of government property. See California I, 332 U.S. at 40 ("[O]fficers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act."). Not only that, but there is no indication that F.E.B.'s predecessors-in-interest were aware of, let alone relied on, the internal government documents identified by F.E.B. See Rio Grande, 599 F.3d at 1184-85 (disregarding government statements of which the plaintiffs were not aware because "they certainly could not have led [them] to believe that the United States had abandoned its claim").

Finally, the remainder of the government actions on which F.E.B. relies—such as the 2004-2006 licensing agreements to use the island for Navy training exercises—were undertaken long after the statute of limitations had run, and are

therefore irrelevant.  See id. at 1185 (finding actions taken after the limitations period to be irrelevant).  For all of those reasons, the actions of subordinate federal employees did not abandon the United States' claim to Wisteria Island.

### 3.  Different government claims

Third, F.E.B. contends the statute of limitations has not run because, in opposing F.E.B.'s SLA claim to the island, the United States now asserts a "different claim" to the island than it asserted in 1951.  But the interest in real property that the United States asserted in 1951 is the same interest that it asserts in this suit:  ownership of Wisteria Island, going back through the entire chain of title to that island.  F.E.B.'s predecessors had actual notice of that asserted interest in 1951.  It is that interest—not "the subjective intent of the government to enforce [the interest] in the face of changed conditions"—that constitutes the government's "claim" for purposes of the QTA's statute of limitations.  Vincent Murphy Chevrolet Co. v. United States, 766 F.2d 449, 451 (10th Cir. 1985).  Although the SLA created a new legal claim to the island for F.E.B.'s predecessors, it did not abolish their preexisting notice of the United States' asserted interest.  See id. at 251-52 (finding the QTA statute of limitations had run because, although the plaintiffs' cause of action was newly available due to recently changed conditions, the plaintiffs had actual knowledge of the challenged government interest for many

18

years prior). F.E.B.'s predecessors remained on notice notwithstanding the fact that any government opposition to their newly minted SLA claim could implicate defensive legal arguments different from the affirmative claims raised in the government's 1951 letter. See id. at 452 ("[F]or purposes of determining when 'the claim' accrues under § 2409a[(g)], all that is necessary is a reasonable awareness that the government claims some interest adverse to the plaintiffs.") (internal alteration, quotation marks omitted); Knapp, 636 F.2d at 283 ("Knowledge of the claim's full contours is not required.").[11]  The QTA's statute of limitations accrues upon notice of the United States' claim—not upon the creation of an adverse claimant's potential cause of action. The United States was not required to reassert its ownership interest after the SLA was enacted in order for the previously triggered limitations period to continue running. See Richmond, 945 F.2d at 770 ("To hold that the limitations period did not begin to run until conditions had changed and the government reasserted its claim would be in effect to extend the limitations period indefinitely, in contravention of Congress's expressed intent.").

---

[11] See also Rio Grande, 599 F.3d at 1176 ("[T]he starting of the limitations clock is not dependent on the plaintiff knowing the precise nature of the property interest upon which the United States predicates its claim of title."); Richmond, 945 F.2d at 770 ("Assuming . . . [the plaintiff] did not know the exact nature of the government's claim in 1938, it still could not escape the limitations bar, for all that is necessary for accrual is a reasonable awareness that the Government claims some interest adverse to the plaintiff's.") (internal quotation marks omitted).

19

### 4. No adverse government action

Fourth, F.E.B. contends the statute of limitations has not run because the government did not take action adverse to F.E.B.'s predecessors' interests either before or after the SLA's 1953 enactment. But the plain language of the QTA is clear: The statute of limitations is triggered as soon as a plaintiff acquires actual or constructive notice of the government's claim. See 28 U.S.C. § 2409a(g) ("[A QTA] action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States."). Courts have consistently declined to require affirmative adverse government action to initiate the limitations period—let alone to keep an initiated period running. See Wisconsin Valley Imp. Co. v. United States, 569 F.3d 331, 335-36 (7th Cir. 2009) ("The Company contends that the clock does not start until the United States uses land in a way incompatible with the private claim . . . . This argument is incompatible with the rule . . . that it is the private party's knowledge (actual or constructive), rather than the United States' bulldozers or other physical activity, that causes a claim to accrue."); Long v. Bureau of Reclam., 236 F.3d 910, 915 (8th Cir. 2001) (holding that a plaintiff's action for an easement accrued in 1949 because, "[w]hile [the plaintiff's] use of [the disputed road] to gain access to

20

his property was not actually denied until 1988, the government's right to deny access was reasonably clear to his predecessor-in-interest in 1949"); Richmond, 945 F.2d at 770 (holding that the limitations period started when the plaintiff first learned of the disputed covenant, not when the government later attempted to enforce that covenant for the first time).[12]

F.E.B.'s reliance on Werner v. United States to argue otherwise is misplaced. See 9 F.3d 1514 (11th Cir. 1993). Werner stands for the common sense proposition that the statute of limitations is not triggered by just any government interest in property, but rather only a claimed interest that is inconsistent with— that is, adverse to— the plaintiff's asserted interest. See id. at 1516-17 (finding the plaintiff's QTA action for an easement across government property accrued not when the plaintiff knew the government owned the property in general, but when the plaintiff realized the government claimed title without an access easement). That proposition is most relevant where a plaintiff asserts a nonpossessory interest, such as an easement; after all, in that context "knowledge of a government claim of

---

[12] See also Rosette Inc. v. United States, 141 F.3d 1394, 1398 (10th Cir. 1998) ("[The plaintiff] knew of the United States' interest in 1978 . . . . The fact that it decided not to contest that interest until a disagreement arose cannot defeat the workings of the statute of limitations."); Knapp, 636 F.2d at 283 (finding that the plaintiff's action accrued when it was first aware of the cloud on its title, not when the government later acted on its claim by approving a survey of the disputed land for the first time); Calif. ex rel. State Land Comm'n v. Yuba Goldfields, Inc., 752 F.2d 393, 397 (9th Cir. 1985) ("Neither the language of the statute nor the legislative history of the Act requires a showing of adversity.") (emphasis added).

21

ownership may be entirely consistent with a plaintiff's claim." Michel v. United States, 65 F.3d 130, 131-32 (9th Cir. 1995) (holding that the plaintiffs' "claim of access to roads and trails across the refuge did not accrue until [they] knew or should have known the government claimed the exclusive right to deny their historic access to the trails and roads across the refuge") (citing Werner, 69 F.3d at 1516). A contrary rule "would lead to premature, and often unnecessary, suits," as citizens currently enjoying access to government land "would be compelled to sue to protect against the possibility, however remote, that the government might someday restrict [their] access." Id. at 132. Accordingly, courts have widely embraced the proposition that the United States must claim "some interest adverse to the plaintiff's" before a QTA claim accrues for purposes of the statute of limitations. See Rio Grande, 599 F.3d at 1176; Cheyenne Arapaho, 558 F.3d at 595; Wisconsin Valley, 569 F.3d at 334-35; Kingman, 541 F.3d at 1198; Spirit Lake, 262 F.3d at 738; Bank One Texas, 157 F.3d at 402 n.11; Richmond, 945 F.2d at 770.

F.E.B. conflates the requirement for an adverse government interest with a requirement for adverse government action. But the two are distinct: Although adverse government action is sufficient to put a plaintiff on notice of a government's claim, it is not necessary. See Wisconsin Valley, 569 F.3d at 335-

22

36; Long, 236 F.3d at 915; Rosette, 141 F.3d at 1398; Richmond, 945 F.2d at 770; Yuba Goldfields, 752 F.2d at 397; Knapp, 636 F.2d at 283.  Therefore, given that F.E.B.'s predecessor had actual knowledge of the government's claim to ownership of the island, the fact that the government did not affirmatively obstruct its or its successors' use of the island before or after the SLA's enactment does not forestall application of the statute of limitations.

### 5.  Hypothetical consequences

Finally, at oral argument, F.E.B. asserted for the first time that a finding of no abandonment by the United States in this case would effectively foreclose the availability of QTA claims for all submerged lands nationwide.  F.E.B. arrives at that sweeping conclusion by fashioning a new argument for the government (an argument not asserted by the government itself)—namely, that the Supreme Court's 1947 decision granting the United States "paramount" rights in submerged coastal lands, see California I, 332 U.S. at 38-39, constituted a "claim" by the United States to all such lands for purposes of the QTA statute of limitations. Starting from that hypothetical premise, F.E.B. contends that, unless the court finds the SLA abandoned all California I "claims," the QTA limitations period on all submerged coastal lands expired long ago.

The problem with F.E.B.'s argument is that it is counterfactual.  The government does not argue that California I triggered the QTA limitations period for Wisteria Island.  Rather, the government asserts that its 1951 letter triggered the limitations period.   In that letter, the United States relied not on California I, but instead on its 1819 treaty with Spain, and 1845 and 1924 Executive Orders, to assert ownership over the island.  As discussed in Section II.A supra, that letter's explicit and unambiguous assertion of a property interest in the island more than meets the QTA's accrual requirements.  We therefore have no reason to consider whether California I constituted a "claim" by the United States to Wisteria Island—or submerged lands in general—in order to decide this case.  Accordingly, we express no opinion on that issue.   Similarly, our holding regarding the SLA's effect on the QTA statute of limitations is narrowly drawn to the facts of this case.  Contrary to F.E.B.'s contention, we need not decide whether the SLA in general abandoned preexisting government claims to submerged lands.  Rather, we hold only that, given the undisputed and well-known facts of Wisteria Island's creation, the plain language of the SLA exception for lands "built up by the United States for its own use," 43 U.S.C. § 1313(a), gave rise to an open and obvious question as to whether the SLA applied in this case.  See supra § II.B.

We leave further explication of these issues to future cases.

24

### III.    CONCLUSION

For the foregoing reasons, we AFFIRM the district court's dismissal of the case for lack of subject matter jurisdiction.  In doing so, we note that the dismissal "does not quiet title to the property in the United States.  The title dispute remains unresolved."  Block, 461 U.S. at 291.