NOT FOR PUBLICATION

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-12383

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

*Plaintiff-Counter Defendant-Appellee,*

*versus*

F.E.B. CORP.,

a Florida Corporation,

*Defendant-Counter Claimant-Appellant.*

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 4:18-cv-10203-JEM

_____

Before ROSENBAUM, NEWSOM, and ABUDU, Circuit Judges.

PER CURIAM:

This case is about ownership of Wisteria Island, a small island just off the coast of Key West, Florida, which was created by

dredging operations by the United States in the 1920s and 1940s. The United States brought this action to quiet title to Wisteria Island against F.E.B. Corp., which traces its ownership of the island to a quitclaim deed Florida issued in 1952.

In a prior appeal, we held that the question of ownership came down to "whether the United States had an intended use for Wisteria Island when the United States created it." *United States v. F.E.B. Corp. ("FEB II")*, 52 F.4th 916, 927 (11th Cir. 2022). And we remanded for trial, because there was a "genuine dispute of fact about whether the United States created Wisteria Island for its own use or whether Wisteria Island's creation was an accident." *Id.* at 931. After a bench trial on remand, the district court found that the United States created Wisteria Island for its own uses, including as a natural protective feature, a site for potential improvements, and a place for future dredge-spoil deposits. The court therefore quieted title for the United States.

On appeal, F.E.B. contends that the district court's "intent" findings lack support in the record, and that Wisteria Island was created without a specific intention or purpose beyond "just disposing of dredge spoils." But because the district court's factual findings are plausible and supported by the record, we affirm.

## I.

Wisteria Island is located on what used to be shoals—or shallow areas in water that are hazardous to navigation—less than a mile off the coast of Key West. The location was at the southern

end of shoals known as the Frankford (or Frankfort) Bank, which formed a natural barrier to the west of the harbor.

## A. Creation of Wisteria Island

Around the time Florida became a state, the United States reserved the "shoals" of Key West for "military purposes" in connection with the development of a naval depot. Correspondence sent in 1908 by Commandant William H. Beehler, at the naval station in Key West, explains that the Navy regarded Frankford Bank as "a part of the Naval Reservation at Key West" for the naval depot, and that "there is a definite claim by the Navy to Frankford Bank." Commandant Beehler also wrote that Frankford Bank was important to naval operations since it formed a natural barrier protecting the harbor, and that the Navy "had contemplated erecting a coal shed" there.

In 1916, during World War I, Beehler's successor at Naval Station Key West, Commandant Warren Terhune, reported to a Navy commission that the advantages of Key West arose from its strategic location at the nation's southernmost continental limits, as well as the Navy's "ownership of . . . Frankford Bank, and other partially submerged [keys] and shoals capable of development." Terhune suggested development possibilities, which included "reclaiming of land by filling, for the purpose of erecting a magazine on Frankford Bank" for "explosive stowage." In other words, according to Terhune, Frankford Bank, where Wisteria Island now sits, "should be enlarged by fill and utilized." Terhune also proposed "the erection of a breakwater to afford a harbor of refuge at

the naval station."  The following year, in 1917, Commandant Ter-hune signed blueprints for the development of a submarine base at Key West, which included plans for "secure and safe wharfage" at the southern end of Frankford Bank.

In 1917, the Navy commission issued a report which noted that station authorities in Key West "agreed that it will be necessary to fill in over present shoal waters at Frankford Bank or Fleming Key, or both."  Commenting on the plans for development, the report said that certain proposed breakwaters could be rendered unnecessary "by a slight filling in on Frankford Bank."

In the early 1920s, the United States began a dredging project to deepen the harbor and channels at Key West.  The project was undertaken by the Army Corps of Engineers on behalf of the Navy.  Dredging refers to excavating sediment from bodies of water.  The material removed during this process is referred to as "spoils" or "spoilage."

In or around 1923, the Army Corps deposited dredged spoils onto the southern part of Frankford Bank, creating a "spoil bank" or island in the rough shape of a kidney bean or crescent.  The area of land above sea level was approximately 2.95 acres.  According to Professor Charlie Hailey, an expert who literally wrote the book on Wisteria Island[1], the shape of the island reflected that the outer

---

[1] Charlie Hailey, *Spoil Island: Reading the Makeshift Archipelago* (2013).  *Spoil Island* is about the construction and use of spoil islands, and it includes a chapter on Wisteria Island.

edge (fronting the harbor) was created first, and then filled in behind. This process, the professor testified, reflected an intent to create a place for future placement of spoil.

In 1924, after the dredging project was complete, the Florida Trustees of Internal Improvement Fund published a notice that it intended to sell the island. After the Navy objected that the island belonged to the United States, and therefore was not Florida's to sell, the state withdrew the notice and did not move forward with the sale.

In response to Florida's proposed sale, the Navy took steps to protect its interests in Frankford Bank and the spoil island. In a letter dated May 17, 1924, the Navy's Chief of the Bureau of Yards and Docks requested the reservation of the spoil island "for possible Navy use." He explained that, in the Navy commission's development plans for the harbor, "Frankford Bank formed the principal protection from wave action from the westward, and [the plans] contemplated the enlarging of Frankford Bank by depositing the dredged material from the harbor along the edge of the bank." The following week, the Chief of Naval Operations made the same recommendation to the Judge Advocate General, citing the "possible future development of Key West as a naval base of much larger proportions and of the desirability of ownership of Frankford Bank to form a breakwater" for the harbor.

Then, in August 1924, Secretary of the Navy Curtis Wilbur sent a formal request for entry of an executive order reserving the shoals and keys around Key West, including Frankford Bank, for

naval purposes.  He wrote that private development on Frankford Bank might be a source of strain with the Navy, and that "[i]f in the future Key West defenses are to be modernized this area would be of great value in connection with outer defense works."  On August 11, 1924, President Coolidge issued an executive order reserving the shoals and keys in the vicinity of Key West, including Frankford Bank, for naval purposes.

In 1928, the Navy issued a revocable license to a private company to use Frankford Bank and the spoil bank in connection with the shark-fishing industry.  The license described Frankford Bank as "[g]overnment property," under the jurisdiction of the Navy, which was "not in use at the present time."

After World War II broke out, the United States began massive dredging operations around Key West.  The project called for providing adequate seaplane landing and take-off areas, deepening the submarine basin, and deepening the main ship channel and harbor turning basin. *FEB II*, 52 F.4th at 921.  The channel-and-turning-basin project was completed in 1943.  During this project, the United States dumped dredge spoils in several designated areas, including where it had dumped spoils in the 1920s. *Id.*

By the time the dredging project was finished, the spoil island on Frankford Bank—what we now call Wisteria Island[2]—had expanded substantially to approximately 39 acres, with around 25

---

[2] Wisteria Island takes it names from a quarantine barge named *Wisteria* that ran aground on Frankford Bank in 1919.

acres of land above the mean low-water line.[3]  In 1945, soon after World War II ended, the Navy rebuffed a request to use Wisteria Island in connection with the private shark industry.

B. *Origins and Development of the Present Dispute*

In 1951, Florida "again noticed its intent to sell Wisteria Island—this time via a quitclaim deed (one with no warranties of title) to a private buyer." *FEB II*, 52 F.4th at 923.  After learning of the proposed sale, local Navy officials sent an internal letter to the Chief of the Bureau of Yards and Docks requesting authority to object.  The letter cited the "security risk" posed by private development and "the strategic location of this spoil area," making "its use for military purposes highly possible," including as a "fuel storage area," which was "now under consideration."  Then, in September 1951, the Navy sent a letter to the state objecting to the sale on the grounds that the spoil island belonged to the United States.

In response, Florida's attorney general acknowledged the United States's claim but expressed doubt as to its validity.  He advised "that the claim is debatable enough and so shrouded in antiquity that I think the best course would be for [Florida] to complete the sale and explain the Navy's claim to [the buyer] and allow him

---

[3] The record is not entirely consistent about the acreage of land above sea level.  Regardless, neither party suggests that the difference between submerged and exposed land, or the specific acreage above sea level, is material to the issue before us on appeal.

to accept the . . . deed at his own risk." Thus, Florida sold Wisteria Island to a private buyer in 1952, notwithstanding the Navy's objections.

The following year, in 1953, Congress passed the Submerged Lands Act ("SLA" or the "Act"), 43 U.S.C. §§ 1301–15, *et seq.* The SLA transferred to states the title and ownership of "lands beneath navigable waters" within the boundaries of states and all lands beneath navigable waters within three geographical miles of the state's coast. 43 U.S.C. §§ 1301(a)(1)–(2), 1311. But Congress expressly excepted from this grant "all lands filled in, built up, or otherwise reclaimed by the United States for its own use." *Id.* § 1313(a).

For many years after that, the United States did not reassert its claim to Wisteria Island. In September 1953, the Navy asked the U.S. Department of Interior to investigate and offer advice "on the validity of the Federal Government's claim to ownership of the area," citing its "potential strategic military value." Then, in 1956, the Chief of the Bureau of Yards and Docks advised in a memorandum that title to Wisteria Island depended on whether it "was built up for Federal use," but that, if it was not so built up, "the Navy is left without a strong argument on which to claim the island." In the Chief's view, the Navy "would have a difficult time in proving that this island was built up for Federal use, inasmuch as the records indicate that the only reason for the establishment of the island in 1943 was a site for the deposit of spoil." A 1956 letter from the commanding officer at the naval station in Key West similarly

noted that "[t]here is nothing on record locally to indicate whether or not it was the intention of the Navy to use the island after it was created," and that there was "no indication that a specific use of the island was contemplated" before 1952.

Meanwhile, "[t]itle passed from private owner to private owner until F.E.B. acquired the island in 1967." *F.E.B. Corp. v. United States ("FEB I")*, 818 F.3d 681, 684 (11th Cir. 2016). And "[t]he federal government appeared to acquiesce to F.E.B.'s ownership, and even entered into licensing agreements with F.E.B. to use the island as a Navy training ground from 2004 to 2006." *Id.*

But in 2011, the United States again asserted ownership over Wisteria Island. *Id.* In response, F.E.B. filed suit under the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a, to establish that it owned the island. The district court found that the QTA's statute of limitations had run, so it dismissed the suit for lack of subject-matter jurisdiction. *Id.* We affirmed on appeal in *FEB I*, holding that the 12-year statute of limitations began to run in 1951, nearly 50 years before F.E.B.'s lawsuit.[4] *Id.* at 687–87. We rejected F.E.B.'s arguments that the United States, through the actions of subordinate employees or the 1953 passage of the SLA, had abandoned its 1951 ownership claim so as to reset the statute of limitations. *Id.* at 690–91, 93. We explained that the Act's exception for lands "'built up by the

---

[4] We note that, in *Wilkins v. United States*, 598 U.S. 152, 158–59, 165 (2023), the Supreme Court held that the Quiet Title Act's twelve-year statute of limitations is a nonjurisdictional claims-processing rule, abrogating *FEB I* in part.

United States for its own use,' gave rise to an open and obvious question as to whether the [Act] applied in this case," and that the title dispute remained unresolved. *Id.* at 693–94.

## II.

In 2018, the United States filed suit under the Declaratory Judgment Act to finally resolve the question of title to Wisteria Island. On cross-motions for summary judgment, the district court granted the United States's motion and denied F.E.B.'s motion. The court reasoned that "the filling in of a spoil area to facilitate Naval dredging operations counts as 'lands filled in . . . by the United States for its own use'" under the Submerged Lands Act. So the court found that Wisteria Island belonged to the United States.

On appeal, we vacated the grant of summary judgment and remanded for trial, holding that a factfinder "must determine the United States's intent in creating Wisteria Island." *FEB II*, 52 F.4th at 927. Interpreting the language of the SLA's exception for filled-in or built-up lands, we "derive[d] three principles" for its application: (1) "the filling in or building up must have some intentionality to it—it cannot be accidental"; (2) "'use' is a broad term—converting to service or employing (again, *for* a purpose)"; and (3) "the Act does not require *actual* use," meaning that, "[a]s long as the land was created to be used, it doesn't matter whether the United States actually used the land." *Id.* at 926–27.

Thus, we reasoned that the question under the SLA was "whether the United States had an intended use for Wisteria Island when the United States created it." *Id.* On that question, the

24-12383                Opinion of the Court                11

United States argued "that Wisteria Island was created for the 'use' of storing dredged soil." *Id.* at 927. We explained that merely dumping dredged spoil to create an island was not enough. *See id.* at 927–28. That is, "if the United States just dumped the spoils in the area with no intention of ever depositing further dredge spoils (or otherwise using Wisteria Island), then the United States did not create Wisteria Island 'for its own use.'" *Id.* at 928. But if "the United States intended to use it not just then but also in the future as a designated place to put dredge spoils from the Key West area, then it created Wisteria Island for its own use—namely as a location to store dredging spoils." *Id.* After all, "'[s]torage' is a use." *Id.* at 927; *see id.* at 926–27 ("'Use' then, can really mean any utility, any way in which the filled in land is 'convert[ed]' to the United States's 'service.'").

But on the summary-judgment record, we were unable to tell "what the United States's intent was at the time it built up what became known as Wisteria Island." *Id.* at 929–30. We noted that a party's intent ordinarily is a "question of fact for the factfinder, to be determined after trial," and that "[b]oth parties ha[d] submitted evidence supporting their positions," so the evidence did not "necessarily resolve[] the question in one party's favor." *Id.* at 927. For that reason, we concluded that there was "a genuine dispute of fact about whether the United States created Wisteria Island for its own use or whether Wisteria Island's creation was an accident." *Id.* at 931. We vacated the entry of summary judgment and remanded for trial. *Id.*

On remand, the district court conducted a two-day bench trial, hearing from various experts, offered by both parties, and receiving voluminous historical records and other documents into evidence. After trial, the parties submitted proposed findings of fact and conclusions of law. The United States maintained that Wisteria Island was intentionally created for several reasons, including as a location to store dredged spoils, as harbor protection from hurricane and tidal forces, and as a potential site for physical improvements. F.E.B. maintained that the evidence showed that "the spoil deposits were placed where they were simply as a by-product of the purposeful dredging of the shipping channel in the 1920s and 1940s," meaning Wisteria Island was born of an "accident of proximity" rather than "an intent to create an island for future use of the land."

The district court entered judgment for the United States. In its order making findings of fact and conclusions of law, the court found that the United States filled in Wisteria Island for its own uses. Those intended uses, according to the court, were as follows: (1) a "location for the recurrent placement of spoil[s]"; (2) a "protective feature" for naval operations from "both natural and manmade incursions"; (3) "non-use (or non-development by private parties)"; and (4) a "site for possible future physical improvements in support of military defenses."

Thus, in the court's view, this was not a case "where the United States randomly disposed of spoil," or "where spoil was intentionally placed in a random area that was otherwise not being

used." "Rather," the court determined, "this is a case where the United States intentionally placed spoil on a location that had strategic value to the Navy and that the United States reserved for the Navy's use." Based on this reasoning, the court held that the United States, not F.E.B., owned Wisteria Island. The court entered judgment quieting title in favor of the United States and against F.E.B. F.E.B. timely appeals.

## III.

On appeal from a bench trial, we review the district court's legal conclusions de novo and its factual findings for clear error. *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1301 (11th Cir. 2020). Clear error is a "highly deferential standard of review." *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1319 (11th Cir. 2007) (quotation marks omitted).

"A factual finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (quotation marks omitted). So "if the district court's account of the evidence is plausible in light of the record viewed in its entirety," we may not reverse the court's findings even if, had we been sitting as the triers of fact, we "would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985). In other words, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574. That's so "even when the district court's findings do not rest on credibility determinations,

14                    Opinion of the Court                    24-12383

but are based instead on physical or documentary evidence or inferences from other facts." *Id.*

## IV.

In the Submerged Lands Act, passed in 1953, Congress largely transferred to states the title and ownership of "lands beneath navigable waters" within the boundaries of states and all lands beneath navigable waters within three geographical miles of the state's coast. 43 U.S.C. § 1301(a)(1)–(2), 1311. But that grant has several exceptions, including for "all lands filled in, built up, or otherwise reclaimed by the United States for its own use." *Id.* § 1313(a).

Our decision in *FEB II* interpreted this exception, resolving the legal framework that governs this case and leaving the following question for the district court to answer on remand: "whether the United States had an intended use for Wisteria Island when the United States created it." *FEB II*, 52 F.4th at 927. That inquiry depends on the United States's intent "at the time" of the buildup or filling in. *Id.* at 930.

The United States's intent, in turn, is a question of fact, to be resolved by the factfinder. *Id.* So we must review the district court's intent findings deferentially, contrary to F.E.B.'s claim that we should exercise de novo review.[5] Although, as F.E.B. notes, the

---

[5] Deferential review applies even assuming the United States's intent is considered a mixed question of law and fact, since the inquiry entailed primarily "case-specific factual issues." *Bufkin v. Collins*, 604 U.S. 369, 382 (2025) ("When

court relied on "historical documents" that were "undisputed" in reaching its intent findings, clear-error review is not limited to situations where the court's findings rest on credibility determinations. *See Anderson*, 470 U.S. at 574. To the extent that F.E.B. makes legal arguments, though, we review those questions de novo.

The district court found that the United States had several intended uses at the time it built up and created Wisteria Island in the 1920s and the 1940s, including spoils storage, wave protection, and potential development. Because the district court's findings are plausible and supported by the record as a whole, we affirm.

Historical documents in the record support the view that the United States created the island intentionally for the Navy's use. Navy documents from the early 1900s, before any buildup occurred, show that Navy officials stationed at Key West viewed Frankford Bank, where Wisteria Island now sits, as under Navy control and important to naval operations there, primarily as a natural barrier protecting the harbor.

More to the point, in 1916, Commandant Terhune advised that Frankford Bank, owing to its strategic location, "should be enlarged by fill and utilized." Terhune initially suggested reclaiming land "for the purpose of erecting a magazine on Frankford Bank." The next year, he submitted plans for "secure and safe wharfage"

---

the tribunal below is immersed in facts and compelled to marshal and weigh evidence and make credibility judgments, the appellate court should usually review a decision with deference.") (cleaned up).

at the southern end of Frankford Bank, in connection with the development of a submarine base. Those plans were reviewed by a Navy commission, which issued a report noting that local officials "agreed that it will be necessary to fill in over present shoal waters at Frankford Bank or Fleming Key, or both." The report also recognized that certain proposed breakwaters could be rendered unnecessary "by a slight filling in on Frankford Bank" to augment the natural protection it provided.

In sum, these records show that, before Wisteria Island was created, the Navy contemplated filling in part of Frankford Bank for (1) protection of naval operations from natural forces and (2) potential physical improvements. So when the United States filled in part of Frankford Bank with dredged spoils several years later, in the early 1920s, it's reasonable to infer that it did so with those purposes in mind.

Indeed, after Florida attempted to sell the small spoil island in 1924, the Navy quickly sought, and obtained, an executive order reserving the area for the Navy's use. In seeking that order, Navy officials explained that their development plans for the harbor had "contemplated the enlarging of Frankford Bank"—which "formed the principal protection from wave action" from the west—"by depositing the dredged material from the harbor along the edge of the bank." And they advised that the "Navy has under consideration the use of this Island," particularly if Key West developed "as a naval base of much larger proportions." In a letter to the president, the Secretary of the Navy opined that "[i]f in the future Key

24-12383                Opinion of the Court                17

West defenses are to be modernized this area would be of great value in connection with outer defense works."

To be sure, F.E.B. is correct that Frankford Bank is not co-terminous with Wisteria Island, that the primary goal of the dredging operation was to deepen navigation channels, and that records of the dredging itself do not reflect the reasons for where the spoils were placed. But it's plausible to infer that, by placing spoils in an area that the Navy had recommended "should be enlarged by fill and utilized," the United States intended to use the land it built up or filled in for its own purposes, including as a protective feature and a site for potential development.

The record also supports a finding that these same purposes—protective feature and potential development—motivated the second buildup of Wisteria Island in the 1940s. Navy documents from 1924 indicate that officials viewed the spoil island at Frankford Bank as important to the development of Key West "as a naval base of much larger proportions." And that prospect arrived with the outbreak of World War II and massive dredging operations in and around Key West harbor. So again, it's reasonable to infer that, by placing spoils in an area the Navy had previously recognized should be built up and utilized, the United States acted according to that plan and "purposely piled [the spoils] into a particular place," rather than simply dumping them in a convenient location. *FEB II*, 52 F.4th at 929.

Finally, the district court plausibly concluded that Wisteria Island was created with the intent to use the location again to

deposit dredged spoils. *FEB II* expressly stated that "if the United States created the island as place for contemporaneous and future dredge-spoil deposits, that still would be 'for its own use.'" 52 F.4th at 931. And we held that there was a "genuine dispute of fact" about that question, *id.* at 931, which means that we viewed the record as sufficient to support a finding in favor of the United States, *see Anderson*, 477 U.S. at 248 (stating that an issue of fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

At trial on remand, the United States presented the testimony of an expert witness, Professor Hailey, who opined that the United States acted with the "intent that it was creating an island for spoil deposition" in the future.[6] Hailey testified that it was "standard practice" to reuse locations for depositing spoils, and that the shape of the spoil bank in 1923 reflected an intent to further fill in the area with dredged spoils. Plus, as we noted in the prior appeal, in relation to the 1940s buildup, "[t]he United States intended the maximum fill height—meaning how tall the island would be—to be five feet over the mean high-water line. But if the available material on the island were leveled, Wisteria Island's flattened elevation would be only three feet over the mean high-water line." *FEB II*, 52 F.4th at 921. In other words, the spoil island had not

___

[6] F.E.B. suggests that Professor Hailey's opinions should have been excluded as unreliable. But we do not consider arguments, such as this one, which are raised for the first time in a reply brief. *See Tallahassee Mem'l Reg'l Med. Ctr. v. Bowen*, 815 F.2d 1435, 1446 n.16 (11th Cir. 1987) ("[A] party cannot argue an issue in its reply brief that was not preserved in its initial brief.").

24-12383                 Opinion of the Court                      19

reached its intended capacity, suggesting future use as a spoils deposit.

F.E.B.'s arguments in response are unconvincing.[7]  F.E.B. relies heavily on the fact that the Navy has never made direct use of Wisteria Island.  But "[a]s long as the land was created to be used, it doesn't matter whether the United States actually used the land." *FEB II*, 52 F.4th at 927.

In a similar vein, F.E.B. questions why, if Wisteria Island was supposedly valuable to the Navy and created intentionally, the United States failed to take "all necessary steps to secure title and ownership of the Subject Property in the 98 years between 1920 and 2018."  F.E.B. notes that, in the 1940s, the United States obtained title to other spoils deposits around Key West, but not to Wisteria Island.

But the question before us is not whether Wisteria Island was or is important to the United States, or whether the United States should have done more to secure title apart from objecting when Florida proposed to sell the land.  The only issue before us is

---

[7] Nonetheless, we agree with F.E.B. that no record evidence supports the view that Wisteria Island was created for the purpose of "non-use (or non-development by private parties)."  Of course, there is evidence the Navy viewed development by private parties as harmful to its interests in Wisteria Island, but that's different from saying it created the island for that purpose.  Even so, though, as we've explained, the record sufficiently supports the district court's factual determination that the United States created Wisteria Island for its own other purposes.

"whether the United States had an intended use for Wisteria Island when the United States created it." *FEB II*, 52 F.4th at 927. As we have already explained, and as the district court found, contemporaneous records suggest that it did.

Moreover, historical documents in the record indicate that the Navy believed it owned Wisteria Island until sometime in the 1950s, when doubt crept in with the sale of Wisteria Island to a private buyer in 1951 and the passage of the SLA in 1953. So the fact that the United States took no action to quiet title in the years after Wisteria Island's creation, or that officials later saw no indication that a specific use was contemplated, "isn't dispositive." *Id.* at 931 ("Because our focus must center on why the land was built, post-creation use (or lack thereof) isn't dispositive."). In applying the SLA's exception, "[w]hat matters is why (at the time of filling in or building up) the land was reclaimed." *Id.*

After a careful review of the entire record, we are not left with a definite and firm conviction that the district court made a mistake. *See Morrissette-Brown*, 506 F.3d at 1319. The record supports the court's findings that the United States, at the time the land was reclaimed in the 1920s and 1940s, intended to use Wisteria Island for its own purposes, including as a protective feature, a site for potential improvements, and a place for future dredge-spoil deposits. All three purposes carried utility for the United States. *See FEB II*, 52 F.4th at 926–27. While F.E.B. points to contrary evidence suggesting that Wisteria Island was created without a specific purpose or intention, that's not enough to show that the district court

clearly erred.  *See Anderson*, 470 U.S. at 573–74 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

## V.

In sum, and for the foregoing reasons, we affirm the judgment in favor of the United States.

**AFFIRMED.**