[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-14047

_____

UNITED STATES OF AMERICA,

Plaintiff-Counter Defendant-Appellee,

*versus*

F.E.B. CORP.,
a Florida Corporation,

Defendant-Counter Claimant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 4:18-cv-10203-JEM

_____

Before WILSON and ROSENBAUM, Circuit Judges, and CONWAY,[*] District Judge.

ROSENBAUM, Circuit Judge:

A small island lies just off Key West, Florida. It was not born in the usual way. No volcanic lava plumes rose from the sea and created it. Rather, about a hundred years ago, the United States labored to dredge oceanic soil from Key West Harbor, which it piled up on the ocean floor. Later, during World War II, the United States conducted further dredging operations in the area and again dumped the soil it collected in the same area in Key West Harbor. At some point during these operations, Wisteria Island was born.

After Wisteria Island's birth, Congress ceded title to all lands within three miles of the United States's coast to the states, except for lands that were (1) "built up," "filled in," "or otherwise re-claimed" (2) by the United States (3) for the United States's use. We must determine whether Wisteria Island satisfies this exception. Only the third requirement is at issue in this appeal: whether the United States created Wisteria Island for its "use."

Plaintiff-Counterdefendant-Appellee United States says that it created Wisteria Island to store dredged soil. Defendant-Coun-terclaimant-Appellant F.E.B., which claims to own the island,

---

[*] The Honorable Anne C. Conway, United States District Judge for the Middle District of Florida, sitting by designation.

rejects the United States's assertion that it built Wisteria Island for its "use." According to F.E.B., the island arose simply as a result of the United States's discarding of the soil it dredged from the channel. After all, F.E.B. says, merely dumping soil in a pile isn't *using* it.

We agree with the United States that, if it created Wisteria Island as a place to store dredged soil, then the United States built up or filled in Wisteria Island for the United States's use. But on this record, we find a genuine issue of material fact exists as to why the United States created the island. So after a thorough review of the record and with the benefit of oral argument, we affirm in part and vacate in part the district court's grant of summary judgment to the United States and denial of summary judgment to F.E.B., and we remand this case for a factual determination of why the United States created Wisteria Island.

## I.    FACTUAL BACKGROUND

### A.    *The Creation of Wisteria Island*

The United States received the land that became Florida—then known as "La Florida"—from Spain in the 1818 Adams-Onis Treaty. *See* Treaty of Amity, Settlement, and Limits, Between the United States of America and    His Catholic Majesty,    Spain-U.S., Feb. 22, 1819, 8 Stat. 252.

Just over twenty-five years later, in 1845, Florida officially became a state. *An Act for the Admission of the States of Iowa and Florida into the Union*, Pub. L. 28-48, 5 Stat. 742 (Mar. 3, 1845).

The Florida Keys, a chain of islands south of mainland Florida, is a part of the state of Florida.  Key West lies at the southwest end of the Keys.  The same year that Florida became a state, President Polk reserved the "shoals" of Key West for "military purposes."

Eventually, in the early 1920s, the United States "dredged"— or removed soil from the ocean floor—in Key West Harbor, piling the dredged oceanic soil (also called "spoils" or "spoilage") up until it became an island.[1]  Just before that, during a hurricane in 1919, a 150-foot ship called the *Wisteria* sank near the shallow ocean floor upon which Wisteria Island was later built.  In recognition of that event, the island that the United States created in that area was called Wisteria Island.

After the dredging was complete, two men applied to buy the island for $500.  The Florida Trustees of Internal Improvement Fund published a notice that it intended to sell the island.  But the Navy Department objected that the island belonged to the United States and therefore was not Florida's to sell.  The Trustees withdrew the notice and rejected the application.  In the meantime, the Navy Department asked the Secretary of the Interior for an executive order reserving the island for military use because the island was "directly under the guns of Fort Taylor" and, if privately developed, might "become a constant source of expense on account of claims by private parties for damages incidental to gun fire."  In

---

[1] The parties dispute whether the spoils location was above or below the water line, but that distinction is irrelevant for purposes of this appeal.

20-14047              Opinion of the Court                    5

addition, it said, "[i]f in the future Key West defenses are to be modernized, these areas would be of great value in connection with outer defense works . . . .  In view of their strategic location for naval purposes . . . it is desired to have them formally reserved for naval purposes."  Just a month later, President Coolidge issued an executive order reserving, for naval purposes, this area near Key West, including Wisteria Island.

This is a map depicting Wisteria Island in relation to Key West.  A red arrow points to Wisteria Island.



The record is silent about what happened to Wisteria Island between the 1920s and 1940s. But after World War II broke out, the United States began a "huge dredging contract" to "provide adequate seaplane landing and take-off areas," moving some 5.4 million cubic yards of spoils over two years. The project also deepened the "submarine basin" to twenty-two feet and "the main ship channel" to thirty feet. During that period, the United States again dumped the dredge spoils where it had in the 1920s. As a result, Wisteria Island expanded to its current size,[2] about twenty-one acres above water and eighteen below, for a total of thirty-nine acres.

The United States intended the maximum fill height—meaning how tall the island would be—to be five feet over the mean high-water line. But if the available material on the island were leveled, Wisteria Island's flattened elevation would be only three feet over the mean high-water line.

One of F.E.B.'s expert witnesses, geotechnical engineer Mr. Roberto Balbis, submitted a report stating that "[i]t appears that the discharge area was not walled off to help contain the discharge and maximize the amount of fill retained" and that the filling of Wisteria Island was "haphazard." In his view, "the haphazard manner of

---

[2] It's possible that the island was originally larger and shrank because of erosion over time. And while that fact may be relevant at trial, the precise details aren't relevant to this appeal.

filling suggests that Wisteria [Island] was simply a place to discard excess spoil not needed for any purpose."

## B.    Legal Developments

Shortly after Wisteria Island reached its current size, oil was discovered in the undersea floor just off the West Coast of the United States. *United States v. California*, 332 U.S. 19, 23 (1947) ("*California I*"). Unsurprisingly, both the United States and the coastal states claimed ownership of the oil. *Id.* In 1947, the Supreme Court settled the dispute by holding that the near-offshore undersea floor belonged to the United States. *Id.* at 40. In response, Congress considered ceding some of the near-offshore undersea floor to the coastal states—the question was how much. *See F.E.B. Corp. v. United States*, 818 F.3d 681, 687 (11th Cir. 2016) ("*F.E.B. I*").

During the legislative process, Secretary of the Navy Robert Anderson testified before Congress that petroleum was crucial to the military and also that the military had bases and other improvements on near-offshore islands. *Submerged Lands: Hearings on S.J. Res. 13, S. 294, S. 107, S. 107 Amendment, and S.J. Res. 18 Before the S. Comm. on Interior & Insular Affs.*, 83rd Cong. 545 (1953) (statement of Robert B. Anderson, Secretary of the Navy). He expressed concern that "in some of the proposed bills[,] title of the United States would be relinquished to all lands beneath navigable waters within State boundaries[,] which is defined to include filled in, made or reclaimed lands." *Id.* at 546. The problem, Secretary Anderson said, was that a "substantial number of military

and naval installations are located on filled in lands and have been improved by the erection of permanent buildings and other structures at a cost to the Government of many millions of dollars." *Id.* So, he concluded, it was "essential that any legislation that would affect lands or installations of the nature described herein should contain appropriate provisions confirming title to and reserving title in the United States to such lands and improvements. In Secretary Anderson's view, then, "[t]hese lands with their structures are truly property which has been developed by the Federal Government and bear no immediate relation to the matter you now have under consideration." *Id.*

One Senator asked Secretary Anderson whether he had a list of the places that should be excluded because they had such improvements. *Id.* at 547. Secretary Anderson responded that he would prefer that "the title to military shore installations could be protected by a general provision." *Id.* But, he said, "[i]f . . . Congress found that it could not properly be so protected, we would be glad to submit such descriptions as you would think appropriate." *Id.* Rear Admiral Ira Nunn, the Judge Advocate General of the Navy, submitted a partial list of such places. *Id.* at 550; *see Bills to Promote the Exploration, Development, and Conservation of Certain Resources in the Submerged Lands and to Provide for the Use, Control, and Disposition of the Lands and Resources of the Lands Beneath Inland Waters and In the Continental Shelf: Hearings on H.R. 2948 and Similar Bills Before the Subcomm. No. 1 of the H. Comm. on the Judiciary*, 83rd Cong. 201 (1953)) (Statement

of Ira Nunn, Judge Advocate General of the Navy). Among those listed was Naval Base Key West.

Attorney General Herbert Brownell, Jr., also testified. *Submerged Lands: Hearings on S.J. Res. 13, S. 294, S. 107, S. 107 Amendment, and S.J. Res. 18 Before the S. Comm. on Interior & Insular Affs.*, 83rd Cong. 925 (1953) (Statement of Herbert Brownell, Attorney General). In his opening statement, he emphasized that the Department of Justice hoped the eventual law would "make certain that all installations . . . on submerged, reclaimed, or filled or other lands" by "the Federal Government" "belong[ed] to [the Federal Government]." *Id.* at 926.

In 1953, Congress passed the Submerged Lands Act (the "Act"), 43 U.S.C. §§ 1301–15, *et seq.*, which transferred to states the title and ownership of "lands beneath navigable waters" within the boundaries of states and all lands beneath navigable waters within three geographical miles of the state's coast. *Id.* §§ 1301(a)(1)–(2), 1311. But Congress expressly excepted from this grant "all lands filled in, built up, or otherwise reclaimed by the United States for its own use." *Id.* § 1313(a).

## C.    Selling Wisteria Island

Meanwhile, two years earlier, in 1951, Florida again noticed its intent to sell Wisteria Island—this time via a quitclaim deed (one with no warranties of title) to a private buyer. *F.E.B. I.*, 818 F.3d at 684. The United States objected to the sale, claiming that the federal government, not the state of Florida, owned Wisteria Island. *Id.* The sale went through, anyway. *Id.*

In 1954, the Navy asked the Bureau of Land Management about its claim to Wisteria Island, explaining that Wisteria Island and the area around Frankfort Bank were of "great strategic importance." The Navy asserted that Wisteria Island was close to "highly classified Naval activities," and it would be a "security risk to allow the island to fall into the hands of private individuals."

Nonetheless, in 1967, F.E.B. acquired the title to Wisteria Island. *Id.* Wisteria Island experienced (legally speaking) a still breeze until 2011. And then the legal clouds began to gather.

## II.    PROCEDURAL HISTORY

### A. *F.E.B. I*

In 2011, the United States asserted ownership over Wisteria Island. *Id.* In response, F.E.B. sued under the Quiet Title Act, 28 U.S.C. § 2409a, arguing that it owned the island. *Id.* at 684–85. The district court held that F.E.B.'s action was time-barred and dismissed the case for lack of subject-matter jurisdiction. *Id.* at 685.

On appeal, we affirmed. Under the Quiet Title Act, a cause of action accrues when "the plaintiff or his predecessor in interest knew or should have known of the claim of the United States" to the real property. *Id.* (citing 24 U.S.C. § 2409a(g)). Florida—F.E.B.'s predecessor in interest—knew of the United States's claim in 1951 because the United States had objected to the sale and claimed ownership at that time. *Id.* So, we said, the twelve-year statute of limitations began in 1951 and ran in 1963, nearly fifty years before F.E.B.'s 2011 lawsuit. *Id.*

We rejected F.E.B.'s argument that the United States had acquiesced in F.E.B.'s ownership or, through the 1953 passage of the Act, abandoned the 1951 claim of ownership so as to reset the statute of limitations. *Id.* at 687. We reasoned that the United States couldn't abandon property without an affirmative congressional act, which needed to be "clear and unequivocal," and the Act did not rise to that level. *Id.* at 688. This was so, we said, because the Act released only *some* submerged lands and excepted those that were filled in, built up, or otherwise reclaimed by the United States for its own use. *Id.* As we explained, the Act wasn't a clear and unequivocal retraction of the United States's claim to Wisteria Island because it wasn't apparent whether Wisteria Island satisfied the filled-in land exception. *Id.*

We abstained from resolving the merits question: whether Wisteria Island *was* "filled in, built up, or otherwise reclaimed by the United States for its own use." *Id.* at 693. Rather, we said "only that, given the undisputed and well-known facts of Wisteria Island's creation, the plain language of the [Act's] exception for lands 'built up by the United States for its own use,' gave rise to an open and obvious question as to whether the [Act] applied in this case." *Id.* (citation omitted). "The title dispute," we concluded, "remains unresolved." *Id.* at 694 (citations omitted).

B.    *The Proceedings in District Court in this Case*

Following F.E.B.'s lawsuit, in 2018, the United States sued F.E.B., seeking a declaratory judgment that the United States, not F.E.B., held title to the thirty-nine acres—twenty acres above sea

level and nineteen below—that made up Wisteria Island. In its answer, F.E.B. disputed that the property at issue was thirty-nine acres, arguing that a little over seventeen acres were not subject to the Act's exception.

The parties filed cross motions for summary judgment. For its part, the United States—seeking summary judgment as to all thirty-nine acres—submitted evidence that the United States had used Wisteria Island "[a]t various times before 1953 . . . as a protective barrier for naval operations . . . ; as a spoil area; and for operational purposes." It argued that there was no factual dispute that the island was created by dredging and used as a spoils location. Wisteria Island, the United States said, was built up by the United States for the United States's use. The United States also said that *F.E.B. I*'s holding—that the United States hadn't clearly and unequivocally conveyed title to Wisteria Island to Florida—required the court to find for the government. Finally, the United States pointed out that the Navy had explicitly referenced Key West Naval Base as a location it wanted protected in a report to Congress while Congress was writing the Act.

F.E.B. responded that Wisteria Island didn't fit in the Act's exception for lands "filled in, built up, or otherwise reclaimed by the United States for its own use" because the Navy had simply discarded the dredged soil there and hadn't done anything on Wisteria Island—flattened the top, built anything on it, or even protected it from erosion. F.E.B. pointed to a 1956 report from the Commander of the Key West Naval Base explaining that "the

deposit of spoil that created Wisteria was 'incidental to the deepening of the ship channel' and that 'there [was] nothing on record locally as to the intention of the Navy to use the Island after it was created." It also relied on testimony from Secretary Anderson, Rear Admiral Nunn, and Attorney General Brownell, Jr., to support its claim that Congress never intended to reserve its claim to Wisteria Island because the executive officers were concerned with retaining lands that the United States had improved, and the United States didn't improve Wisteria Island.

Second, F.E.B. said our decision in *F.E.B. I* didn't control the outcome because we had explicitly left open whether Wisteria Island fit within the Act's exception. F.E.B. also attached numerous expert reports, including an expert report from grammarian Mr. Bryan Garner, linguist Dr. Barry Schein, and surveyor Mr. Michael Finkbeiner. Mr. Garner's and Dr. Schein's reports—as well as parts of Mr. Finkbeiner's report—concluded that the phrase "for its own use" in the Act must have independent meaning from "built up or filled in" because the language would otherwise be surplusage. F.E.B. didn't argue that summary judgment was improper for all thirty-nine acres because part of Wisteria Island wasn't subject to the Act's exception, as it wasn't made of dredge spoils.

The United States moved to exclude the expert reports as improper expert opinions because they purported to analyze and interpret statutes. Thus, the United States argued, the reports invaded the province of the judge. For its part, F.E.B. asserted that the expert-witness testimony wasn't excludable because it was

helpful in analyzing the grammatical structure of the statute, even if it went to the ultimate issue.

The district court entered summary judgment for the United States. It began by defining the question at summary judgment: whether the "incidental but deliberate creation" of Wisteria Island was "for [the United States's] own use." Next, the district court concluded that *F.E.B. I* was persuasive, but not binding, authority that Wisteria Island was created for a distinct purpose. That Wisteria Island had no future use, the district court reasoned, wasn't relevant because the word "future" was not in the statute. The district court declined to rely on the grammarian expert reports because, it said, statutory interpretation is the exclusive province of the court and, if there were any ambiguity, the district court was required here to construe the statute in favor of the United States.

After the district court granted the United States's summary-judgment motion, the United States submitted a proposed judgment decreeing that the United States owned all thirty-nine acres of Wisteria Island. F.E.B. objected. In its view, only the twenty acres above sea level could be characterized as "filled in" under the Act's exception. The district court entered judgment against F.E.B., awarding all thirty-nine acres of Wisteria Island to the United States.

F.E.B. reiterated its argument that some of the land wasn't "filled in" in Rule 59(e), Fed. R. Civ. P., and Rule 60, Fed. R. Civ. P., motions. The district court ordered the parties to address

whether F.E.B. abandoned or waived the argument in its Rule 59(e) and Rule 60 motions when it failed to make it in response to the United States's motion for summary judgment.

In response, the United States said that F.E.B. had waived the argument because it had agreed that the "Subject Property" was thirty-nine acres and that the relevant question was whether the Act applied to those thirty-nine acres. F.E.B. took the opposite position. It reasoned that it had preserved its argument through its expert reports showing that not all of the thirty-nine acres were made of dredged soil. The district court denied F.E.B.'s Rule 59(e) and Rule 60 motions for three reasons. It concluded that F.E.B. hadn't preserved the argument through references in some expert reports, that F.E.B. had invited the error in framing its summary-judgment briefing, and, that, on the merits, the Act applied to land in question.

F.E.B. now appeals both the entry of summary judgment and the denial of its post-judgment motions.

## III.    STANDARD OF REVIEW

We review the grant or denial of summary judgment de novo. *B&G Enters., Ltd. v. United States*, 220 F.3d 1318, 1322 (11th Cir. 2000).

As for the district court's decisions about "the admissibility of expert testimony and the reliability of an expert opinion," we review them for abuse of discretion. *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc). Under this standard,

"we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." *Id.* at 1259.

We likewise review for abuse of discretion the district court's denial of a Rule 60(b) motion for relief from a judgment or order. *Arthur v. Thomas*, 739 F.3d 611, 628 (11th Cir. 2014). The same is true of our review of the district court's denial of a Rule 59(e) motion to alter or amend a judgment. *Stone v. Wall*, 135 F.3d 1438, 1442 (11th Cir. 1998).

## IV.    DISCUSSION

F.E.B. makes three arguments on appeal. First, F.E.B. asserts that the district court erred in entering summary judgment for the United States because Wisteria Island wasn't created for the United States's "own use." Second, F.E.B. claims that the district court erred in disregarding F.E.B.'s expert witnesses' reports on the statutory interpretation of the Act. And third, F.E.B. contends that the district court erred in denying its post-judgment motions to amend or otherwise relieve F.E.B. of the district court's judgment here.

### A. Submerged Lands Act

We first must decide whether the Submerged Land Act's exception for land "created for [the United States's] own use" applies to Wisteria Island.

Because this is a case about the meaning of a statute, we begin "with the statutory text, and end[] there as well if the text is

unambiguous." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). The Supreme Court has instructed that we should generally construe words "as taking their ordinary meaning at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (alterations adopted and internal citations omitted). Here, Congress passed the Act in 1953, so we consult contemporaneous dictionaries. *Id.*

We begin with the word "for." "For" in this context requires intent. The fourth edition of *Black's Law Dictionary*—published in 1951—defined "for" at least in part as "[t]he cause, motive or occasion of an act, state[,] or condition." *For*, *Black's Law Dictionary* (4th ed. 1951). And the *New International Dictionary* of the same era described it similarly. *For*, *New International Dictionary* (1952) ("having as goal or object; in order to be, become, or act as"). *Cf. Textron Lycoming Reciprocating Engine Div., Avco Corp. v. United Auto. Aerospace & Agric. Implement Workers Loc. 787*, 523 U.S. 653, 656 (1998) ("It is true enough . . . that one of the numerous definitions of the word 'for' is . . . '[w]ith the purpose or object of.'") (citation omitted). The contemporaneous dictionaries then, establish that land is filled in "for" the United States's use when the land is filled in "with the purpose or object" that the United States will use it—in other words, not accidentally.

The other key word is "use." "Use," in the 1950s, had a broad definition. The fourth edition of *Black's Law Dictionary* defined "use" as "to make use of, to convert to one's service, to avail one's self of, to employ" and as the "act of employing everything,

or state of being employed, application; employment, as the use of a pen, or his machines are in use. Also the fact of being used or employed habitually[.]" *Use*, *Black's Law Dictionary* (4th ed. 1951). The 1952 *New International Dictionary* defined "use" as "to convert to one's service, to avail oneself of"; to "engage in, carry one, indulge in" and "function." *Use*, *New International Dictionary* (1952). "Use" then, can really mean any utility, any way in which the filled in land is "convert[ed]" to the United States's "service."

Applying those definitions here, we derive three principles. First, because of the presence of the word "for," the filling in or building up must have some intentionality to it—it cannot be accidental. *Id.* The United States does not "build up" an island *for* its own use accidentally. Second, "use" is a broad term—converting to service or employing (again, *for* a purpose). And third, we note that the Act does not require *actual* use. That is, the text does not demand that the use be employed. As long as the land was created to be used, it doesn't matter whether the United States actually used the land.

The question, then, is whether the United States had an intended use for Wisteria Island when the United States created it. "As a general rule, a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined after trial." *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1476 (11th Cir. 1991). Both parties have submitted evidence supporting their positions. On this record, we cannot say that

evidence necessarily resolves the question in one party's favor. So we hold that a factfinder must determine the United States's intent in creating Wisteria Island.

The United States argues that Wisteria Island was created for the "use" of storing dredged soil. As the United States explains the island's history, the United States completed a dredging project in the 1920s, dumping spoils in the area that became known as Wisteria Island. But that wasn't the only time the United States deposited spoils there. Twenty years later, the United States carried out another dredging project and again dumped the spoils in the same area—this time on top of the older spoils. The United States suggests that, when Wisteria Island was created, it served as a designated storage site for dredging spoils extracted from the Key West area.

We agree that, if true, this purpose could fit within the Act's "for its own use" exception. "Storage" is a use. So if that was the United States's intent in creating Wisteria Island—to establish a storage location for spoils from the Key West area at the time of the original buildup in the 1920s and also beyond—the United States "convert[ed] [the soil] to [its] service." *Use, New International Dictionary* (1952).

But uncritically accepting the premise that the concept of "storage" fits within "use" would eviscerate the meaning of the latter term. That is, the United States could argue that anytime it put dredge spoils (or even trash) in a spot, and those deposits created land, it was "storing" the spoils or trash there. Under that theory,

*all* filled-in or built-up lands would be created for the "use" of storing dredged spoils.  The phrase "for its own use" would be surplusage—a result we strive to avoid.  *See* A. Scalia & B. Garner, *Reading Law:  The Interpretation of Legal Texts* 174 (2012) ("[No words] should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.").

So how do we draw the line between storage that is "use" and simple dumping?  Speaking in normal parlance, when we put soil (or anything else) in a particular place, sometimes we are storing it and other times we are disposing of it.  The difference between storage and discarding is, in our view, an intent of future use.[3]  For instance, when we put unwanted trash in the trashcan, we are disposing of it because we don't want it anymore and don't intend to use it; we aren't "storing" it there.  On the other hand, when we leave the car in the garage, we are storing it (not disposing of it) because we are going to use it in the future.

Applying that logic here, we consider the United States's intentions when it built up what became known as Wisteria Island.  If, at that time, the United States intended to use it not just then but also in the future as a designated place to put dredge spoils from the Key West area, then it created Wisteria Island for its own use— namely as a location to store dredging spoils.  But if the United States just dumped the spoils in the area with no intention of ever

---

[3] Still, as we have noted, there is no requirement that the United States *actually* use the land in the future.

depositing further dredge spoils (or otherwise using Wisteria Island), then the United States did not create Wisteria Island "for its own use." Rather, it just discarded the spoils in a pile that became known as Wisteria Island. And that does not qualify as "for its own use."

The Supreme Court's decision interpreting the Act, *California ex rel. State Lands Commission v. United States*, 457 U.S. 273 (1982) ("*California II*"), reinforces this analysis. In *California II*, the United States had built protective barriers at the entrance of Humboldt Bay. Over time, as the bay's tides moved sand, that water movement caused sand to build up around the barriers, creating dry land. *Id.* at 275. The United States and California debated who owned land that had accreted around the jetties.[4] *Id.* at 276. The Supreme Court resolved the case on choice-of-law and riparian-law grounds. It concluded that, under applicable federal law, accreted lands belonged to the upland owner, the United States. *Id.* at 285–86.

But California also made a second, independent argument. It contended that, even if the accreted land belonged to the United

---

[4] "Accretion" occurs when water "gradual[ly] and imperceptibl[y]" deposits silt, sand, soil, or sediment on an existing structure "so as to create new dry land in an area that was previously covered by water." *Proof of Accretion or Avulsion in Title and Boundary Disputes Over Additions to Riparian Land*, 73 *Am. Jur. Proof of Facts* 3d 167 (Sept. 2022 Update), I.B., § 6.

A jetty is a barrier projecting into the sea or other body of water to protect a harbor. *Webster's Universal College Dictionary* (1st ed. 1997).

States, the Act constituted an express surrender of the title. *Id.* at 286. The Supreme Court rejected this argument because the Act didn't apply to accreted land. *Id.* at 287 ("We do not read this provision of the Act as applying to the gradual process by which sand accumulated along the shore, although caused by a jetty affecting the action of the sea."). And even if the Act had applied, the Supreme Court said, the accretions fit the exception for "all lands filled in, built up, or otherwise reclaimed by the United States for its own use." *Id.* at 287.

While this final statement is dicta,[5] it is Supreme Court dicta. So we apply it as much as the text of the statute allows. *See Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) ("[T]here is dicta and then there is dicta, and then there is Supreme Court dicta."). Applying those facts here, if the unintentional accretion of

---

[5] That statement is dicta for two reasons. First, we so characterized it in our prior appellate decision interpreting this statute. *See F.E.B. I*, 818 F.3d at 689 ("*In California II*, the Supreme Court stated in dicta that the SLA exception for land built up by the United States 'for its own use' would apply to coastline that had slowly accreted after the United States constructed jetties nearby[.]"). We are bound by that determination here. *Smith v. GTE Corp.*, 236 F.3d 1292, 1304 (11th Cir. 2001) (explaining that the prior panel precedent rule applies to the earlier case's "reasoning and result"). Second, because the Supreme Court held that the Act didn't apply, its statement that an exception to the Act would apply wasn't necessary to decide the case. *Jordan v. Hamlett*, 312 F.2d 121, 124 (5th Cir. 1963) ("In any event, what was said there in this regard was not necessary to the holding[] and was dictum."). The Supreme Court's decision would be unchanged if the sentence about the Act's exception were eliminated because the Supreme Court held that the Act didn't apply at all.

land around a jetty that the government built for its own use could qualify for the Act's "use" exception, then if the United States intended what eventually became Wisteria Island to serve as a location for dredging-spoil deposits, that land purposefully piled into a particular place would also qualify.[6]

---

[6] Some might suggest that *California II* could be read as creating a rule that the Act does not require an intended use for the land at all. After all, the land accreted around the jetties in *California II* inadvertently—the United States did not fill it in for its own use (though, of course, the United States did build for its own use the jetties around which the land accreted). But we don't read *California II* this way because it would cause the language in the Act—"filled in *for* the [United States's] *use*"—to be surplusage. That is so because, if inadvertently created land were land created "for the United States's use," then *all* land would qualify under the exception, and the "for its own use" phrase would be meaningless.

The Supreme Court in *California II* had no occasion to consider whether the Act included a use requirement because it held the Act didn't apply at all to the land in question and devoted only a paragraph to the topic. *See Schwab*, 451 F.3d at 1325 (following dicta because "[t]his is not subordinate clause, negative pregnant, devoid-of-analysis, throw-away kind of dicta. It is well thought out, thoroughly reasoned, and carefully articulated analysis by the Supreme Court describing the scope of one of its own decisions").

We are duty-bound to follow the Supreme Court's decisions but we don't unnecessarily follow dicta to the point at which the result would conflict with the express text of a statute. *See, e.g., Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2498 (2022) ("Dicta that does not analyze the relevant statutory provision cannot be said to have resolved the statute's meaning. . . . [T]he Court's dicta, even if repeated, does not constitute precedent and does not alter the plain text of the General Crimes Act[.]").

F.E.B. rejects this conclusion, relying on an expert witness (Mr. Balbis) who said that "[i]t appears that the discharge area was not walled off to help contain the discharge and maximize the amount of fill retained" and that the filling of Wisteria Island was "haphazard." Mr. Balbis continued that "the haphazard manner of filling suggests that Wisteria [Island] was simply a place to discard excess spoil not needed for any purpose." Maybe so. But even if it was, that does not necessarily mean that the United States did not create Wisteria Island "for its own use." As we've explained, if the United States created the land with the intent of designating a dredge-spoils dumping ground (or a place to "store" the dredge spoils, as the United States describes it)—not just for the original dredging project in the 1920s but for other dredging projects in Key West Harbor in the future—then it created the island "for its own use."

On this record, we can't tell. To be sure, the United States argues that it built Wisteria Island for the purpose of storing dredge spoils. And the United States did, in fact, later use Wisteria Island for the dumping of additional dredge spoils. But as we've noted, F.E.B. has also presented evidence from its experts that a factfinder could find supports the notion that the United States had no plan for future use of Wisteria Island when it created the land. So on this record, it's not clear to us what the United States's intent was at the time it built up what became known as Wisteria Island. For that reason, a factfinder must determine what the United States's intent was. *Williams v. Obstfeld*, 314 F.3d 1270, 1277 (11th Cir.

2002) ("[T]he existence of knowledge or intent is a question of fact for the factfinder, to be determined after trial.").[7]

The parties argue instead that each is entitled to full summary judgment. We are not persuaded.

*First*, we reject the United States's argument that we are bound by *F.E.B. I*'s statement that "Wisteria Island's origin is undisputed: It was built up by Navy contractors, who used the land for the government's purpose and benefit of storing fill accumulated from nearby dredging operations." *F.E.B. I*, 818 F.3d at 688. To the contrary, *F.E.B. I* explicitly declined to decide whether the Act's exception applied to Wisteria Island. *Id.* at 693 (holding that the facts of Wisteria Island's creation "gave rise to an open and obvious question as to whether the [Act] applied" leaving "further explication of these issues to future cases").

*Second*, we find unpersuasive the United States's appeal to the presumption that "grants of federal property are construed strictly in favor of the United States." *F.E.B. I*, 818 F.3d at 689. The presumption is that "nothing passes except what is conveyed in

---

[7] The trial will be a bench trial because neither side demanded a jury trial. *See* Fed. R. Civ. P. 38 (d) ("A party waives a jury trial unless its demand is properly served and filed."); *cf. United States v. Florida*, 482 F.2d 205, 207 (5th Cir. 1973) (holding non-jury trial where United States filed a declaratory judgment action to quiet title). In addition, F.E.B. was not entitled to a jury trial because it counterclaimed against the United States. *See* 28 U.S.C. § 2409a ("A civil action against the United States under this section shall be tried by the court without a jury.").

clear language." *United States v. Union Pac. R.R. Co.*, 353 U.S. 112, 116 (1957). But here, the Act is an explicit textual grant of federal property. The only question is whether Wisteria Island fits within an exception to that clear grant. That answer turns not on the clarity of the textual grant but on the facts about the purpose (or lack thereof) underlying Wisteria Island's creation.

And *third*, the United States points out that, when asked for a list of "filled in" lands, Rear Admiral Nunn submitted a list to Congress that included the naval station at Key West. That fact might well be evidence that the factfinder could consider. But Rear Admiral Nunn's submission—as a member of the executive branch—is evidence of executive intent, not legislative intent. The United States hasn't directed us to—nor have we found—a congressional report or committee report that Congress specifically intended to retain title to Wisteria Island—only that the executive branch wanted Congress to do so. *See Demby v. Schweiker*, 671 F.2d 507, 511 (D.C. Cir. 1981) (rejecting "the contention that the views of an officer of the Executive Branch . . . constitute evidence probative of congressional intent under the circumstances here").

In short, the United States has submitted only enough evidence that it created Wisteria Island for its own use to get to a trial—not for judgment as a matter of law.

F.E.B.'s arguments fare no better. *First*, F.E.B. contends that "dredging is not a use." This is so, F.E.B. says, because all dredged lands are filled-in lands. So F.E.B. posits that if dredged lands were "lands filled in, built up, or otherwise reclaimed by the United

States *for its own use*," 43 U.S.C. § 1313(a) (emphasis added), merely because the United States had dredged them, then "for its own use" would be redundant of "lands filled in, built up, or otherwise reclaimed by the United States." Put simply, F.E.B. reasons, the phrase would lack meaning.

We agree that, if the United States's discarding of spoils—never intended for any future purpose—constituted use, then the word "use" would be surplusage. But as we've explained, if the United States intended to use what became Wisteria Island as a designated dumping location for future dredge spoils, that's a "use" in the same way that a garbage dump is a "use" of the land on which it is located.

*Second*, F.E.B. emphasizes that the United States never used Wisteria Island in a more traditional sense. That is, the military never built a structure on it and the United States never otherwise improved it in any way. But because our focus must center on why the land was built, post-creation use (or lack thereof) isn't dispositive. What matters is why (at the time of filing in or building up) the land was reclaimed. Was it accidental or was it for a reason? To be sure, that the United States never built an installation on the island may be probative of the fact that the United States didn't "fill in" Wisteria Island for use as a military base. But it isn't probative of whether the United States built Wisteria Island *at the time* for a purpose. Besides, the record shows that the United States did deposit additional dredge spoils about twenty years after it originally filled in the area. So again, if the United States created the island as

place for contemporaneous and future dredge-spoil deposits, that still would be "for its own use."

*Third*, F.E.B. relies on legislative history to show that Congress never intended for the Act to cover Wisteria Island. It cites the testimony of Secretary of the Navy Robert Anderson, Rear Admiral Ira Nunn, and Attorney General Herbert Brownell, Jr. But none of the three were members of the legislative branch, so their views can tell us little about what *Congress* intended. *See Demby*, 671 F.2d at 511.

As the District of Columbia Circuit has put it, "[executive officials'] views are binding neither upon Congress nor the courts in determining the meaning of this congressional enactment. They are, in essence, no more than free advice on the subject of how Congress might, if it chose, achieve a particular end." *Id.* Rather, "Congress' acceptance or rejection of such counsel suggests little about its true legislative intent. The only value of such comment is as an interpretation by an administrative official." *Id.* We agree.

On this record, there is a genuine dispute of fact about whether the United States created Wisteria Island for its own use or whether Wisteria Island's creation was an accident. Given that a genuine dispute of material fact exists, we must vacate the district court's entry of summary judgment and remand for trial.

### B.    Expert Witnesses

F.E.B. also raises some arguments about its experts. First, it asserts that the district court abused its discretion in excluding

F.E.B.'s expert witnesses' testimony on the meaning of "for its own use." And second, F.E.B. contends that the district court abused its discretion when it excluded the report of Mr. Finkbeiner, its expert surveyor, because, in F.E.B.'s view, the report would have been helpful. We disagree.

Under Federal Rule of Evidence 702, a witness with particular "knowledge, skill, experience, training, or education" may offer opinion testimony if that witness's knowledge "will help *the trier of fact* to understand the evidence or to determine a fact in issue[.]" Fed. R. Evid. 702 (emphasis added).

The district court did not abuse its discretion in excluding F.E.B.'s experts because statutory interpretation is a legal question for a judge, not a factual question for the trier of fact. *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1129 (11th Cir. 2018). And at summary judgment, there is no trier of fact. Rather, the district court answers legal questions and determines whether enough evidence allows for a rational trier of fact to find for the non-moving party. *See* Fed. R. Civ. P. 56; *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 569 (11th Cir. 1990) ("[T]he district court inappropriately acted as the trier of fact and erred in granting summary judgment to Bankers."). While expert witnesses may offer opinions on an "ultimate issue" in a case, they may not offer "legal conclusions." *Commodores*, 879 F.3d at 1128–29. In *Commodores Entertainment Corporation*, for instance, the excluded expert report opined that the "original members 'owned the underlying

marks jointly as tenants in common.'" *Id.* at 1129. We said this legal conclusion was "properly struck." *Id.*

Assuming without deciding that legal-conclusion expert reports may be admissible in limited circumstances,[8] the district court didn't abuse its discretion in excluding the reports here.

Mr. Garner's expert report was explicitly a legal opinion. He acknowledged that, "[a]s a textualist, [he] abstain[ed] from using legislative history." Then he told the district court that he "believe[d]" his opinions "accord[ed] with sound principles of textual interpretation, and in [his] opinion the provision in question is unambiguous." Given that which interpretive sources to use and the ambiguity of a statutory provision are unquestionably matters of statutory interpretation, the district court did not abuse its discretion in excluding the report.

Dr. Schein's report is perhaps a slightly closer call (but not much). Dr. Schein offered background principles of English grammar, explaining how causative verbs function. But Dr. Schein also characterized his retention as an expert as being "to interpret sections of the Submerged Lands Act." As we have discussed, though, statutory interpretation is a matter for a judge. So we cannot say

---

[8] We can imagine circumstances in which such testimony—say, about foreign law or about the historical underpinnings of a term or phrase—might be helpful. *See, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (analyzing the original public meaning of the Second Amendment).

20-14047               Opinion of the Court               31

that the district court exceeded the bounds of its discretion in excluding Dr. Schein's report.

Finally, F.E.B. asserts that the district court abused its discretion when it struck parts of the report of F.E.B.'s expert surveyor, Michael Finkbeiner.[9]  We disagree.

The district court did not err in striking the parts of the report that it excluded because Finkbeiner (1) defined legal terms; (2) opined on whether the United States in fact "filled in" the subject property or (3) explained the legal history of Wisteria Island.  The district court did not need any assistance in finding or applying legal definitions.  See Commodores, 879 F.3d at 1128–29.  It therefore did not abuse its discretion in excluding parts of the surveyor's report.

### C.    Reconsideration

Finally, F.E.B. argues that the district court erred in awarding all thirty-nine acres of Wisteria Island to the United States because the land below the water line is not "filled in" land.  It says that the only competent evidence—a surveyor's report—described the submerged land as "non-filled seabed."  F.E.B. also claims that

_____

[9] We aren't sure whether the district court actually excluded the report.  The district court did not reference Finkbeiner's report.  Nor did it describe the surveyor Finkbeiner in the excluding language of its order—referring to only "[l]inguists, legal lexicographers, and grammarians."  But it granted the United States's motion—which sought to exclude parts of Finkbeiner's report—in full.  So we proceed as if the district court excluded the requested portions of Finkbeiner's report.

it preserved the argument when, in its answer to the United States's complaint, it denied that all thirty-nine acres were subject to the Act. Because submerged land cannot be considered "filled in," F.E.B. reasons, the district court clearly erred in awarding the United States title to those parts of Wisteria Island. We are not persuaded.

The district court did not abuse its discretion in denying F.E.B.'s motions because F.E.B. failed to preserve the issue. Litigants cannot use a Rule 59(e) motion to "raise argument or present evidence that could have been raised prior to the entry of judgment." *Michael Linet, Inc. v. Vill. of Wellington*, 408 F.3d 757, 763 (11th Cir. 2005). The same goes for Rule 60(b). *Arthur*, 739 F.3d at 628.

Here, the United States sued for a declaration that it owned *all* thirty-nine acres of Wisteria Island. It also moved for summary judgment as to *all* thirty-nine acres of Wisteria Island. F.E.B. did not respond by arguing that summary judgment as to all thirty-nine acres would be improper; it argued only that Wisteria Island wasn't "filled in or built up" for the United States's own use within the meaning of the statute. F.E.B. never asserted that below-sea-level spoils weren't "built up." Because F.E.B. didn't develop this argument before the district court granted summary judgment, the district court didn't abuse its discretion in denying the motions.

To be sure, F.E.B. mentioned this distinction in three places: (1) in one paragraph of its Answer; (2) in one sentence of its own motion for summary judgment; (3) in one sentence of one expert

report. But those three snippets cannot preserve the issue. District courts resolving summary-judgment motions are not on buried-treasure hunts. And "[a] passing reference to an issue in a brief is not enough[.]" *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012). When the United States moved for summary judgment as to all thirty-nine acres, F.E.B. had to "plainly and prominently" clarify that it (thought that it) had title to the underwater acres regardless of the status of the above-sea-level land. *United States v. Willis*, 649 F.3d 1248, 1254 (11th Cir. 2011). It did not do so. For that reason, the district court did not abuse its discretion in refusing to consider F.E.B.'s fallback position.

## V.　CONCLUSION

If Wisteria Island was "filled in" or "built up" *for* the United States's "use," then it belongs to the United States. But on this record, we are unsure of the United States's intent in creating Wisteria Island. The reason the United States created Wisteria Island remains the subject of a genuine question of fact that must be answered by a trier of fact. So we affirm in part and vacate in part, remanding for further proceedings consistent with this opinion.

**AFFIRMED IN PART** and **VACATED AND REMANDED IN PART**.